**Exhibit "2"**

# BRIDGE FINANCING AGREEMENT
## DEBTOR-IN-POSSESSION

This Bridge Financing Agreement (the "*Agreement*") is entered into as of the __ day of February, 2010 by and between Karykeion, Inc., a California corporation ("*Borrower*"), the Debtor in Possession in *In re Karykeion, Inc.*, Chapter 11 Case No. 2:bk-08 17254 MT (the "*Bankruptcy Case*"), currently pending in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "*Bankruptcy Court*") and Avanti Health System, LLC ("*Lender*"), in order to provide liquidity for Borrower in the Bankruptcy Case and to facilitate the acquisition by Lender of substantially all of the assets of Borrower relating to Community Hospital of Huntington Park (the "*Asset Sale*"), as further provided in the Asset Purchase Agreement between Lender and Borrower of even date herewith (the "*Asset Purchase Agreement*"), and to which this Agreement is attached as Exhibit A. In consideration of the mutual covenants set forth in this Agreement, the Asset Purchase Agreement, and the other Transaction Agreements relating hereto and thereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## 1.    DEFINITIONS.

Capitalized terms used in this Agreement shall have the meanings ascribed to such terms in this Section 1 unless otherwise expressly specified herein.

"*Accounts*" means, in addition to the definition of accounts in the UCC, all presently existing and hereafter arising accounts receivable, contract rights, and all other forms of obligations owing to Borrower arising out of the sale, lease, license or assignment of goods or other property, or the rendition of services by Borrower, whether or not earned by performance, and Borrower's Books relating to any of the foregoing.

"*Administrative Expense*" means a claim against Borrower and/or its estate in the Bankruptcy Case that is an administrative expense claim having priority over unsecured claims pursuant to Section 503(b) of the Bankruptcy Code.

"*Administrative Fees and Expenses*" means any claim, as allowed by the Bankruptcy Court, against Borrower for professional fees or expenses pursuant to Bankruptcy Code sections 327, 328, 330 and/or 333.

"*Advances*" means all loans, advances and other financial accommodations made by Lender to or on account of Borrower.

"*Adverse Claim*" means the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek any order, judgment, determination, or similar relief: (a) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Obligations, or liens and security interests securing such Obligations; (b) preventing, hindering, or delaying, whether directly or indirectly, the assertion or enforcement by Lender of the liens or realization upon any of the respective

Collateral, other than to protest in good faith the existence of a Default or Event of Default; or (c) week challenging the liens or claims of, or seeking an affirmative recovery from Lender.

"*Affiliate*" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls any of the outstanding voting and/or Equity Interests of such Person, or (ii) is controlled by or is under ownership or control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"*Approved Budget*" means the rolling thirteen (13) week cash revenue and expense budget compiled by week and showing the weekly and cumulative expenses, revenues, Cash Shortfall and Advance needs and otherwise in form and substance satisfactory to Lender in its sole discretion and that has been approved in writing (including by attachment to this document) by Lender. The initial Approved Budget is attached as Exhibit A hereto. The Approved Budget shall be Exhibit A, as modified or revised from time-to-time in accordance with this Agreement or otherwise with the prior written approval of Lender.

"*Assets*" means all real and personal property of Borrower, whether now owned or existing, or hereafter acquired or arising, and wherever located, and whether owned before or after the Petition Date including all of the following assets, properties and interests in property of Borrower: all Accounts; Equipment; General Intangibles; Payment Intangibles; Chattel Paper; Inventory; Negotiable Collateral; Investment Property; Financial Assets; Deposit Accounts; Documents; money or any assets of Borrower, including assets which hereafter come into the possession, custody, or control of Lender; all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, lease, license or other disposition of the foregoing, or any portion thereof or interest therein, and all proceeds thereof; and all other property of Borrower's estate in the Bankruptcy Case or otherwise.

"*Asset Sale*" means the sale of substantially all of the Assets of Borrower to Lender or its designee, subject to and in accordance with the terms of the Asset Purchase Agreement.

"*Asset Purchase Agreement*" means that certain Asset Purchase Agreement by and between Lender and Borrower of even date herewith, as it may be amended, restated or modified from time to time.

"*Authorized Officer*" means any duly appointed and acting officer of Borrower, who is legally authorized and empowered to represent Borrower and transact business on behalf of Borrower as contemplated hereunder.

"*Avoidance Action*" means all actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Section 552(b), Section 506(c) and Sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

"**Bankruptcy Court Order**" means the order of the Bankruptcy Court entered in the Bankruptcy Case pursuant to Section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code, on an emergency, interim, final or other basis, each and all in form and substance acceptable to Lender in its sole and absolute discretion after, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto.

"**Borrower's Books**" means all of Borrower's books and records including all of the following: ledgers; records indicating, summarizing, or evidencing Borrower's assets or liabilities; all information relating to Borrower's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information, and the facilities containing such information, but specifically excluding Borrower's corporate minute books, stock ledgers and the like.

"**Business Day**" means any day which is not a Saturday, Sunday, or other day on which banks in the State of California are authorized or required to close.

"**Carve Out**" means an exception to Lender's Liens on the Collateral under Sections 364(d) of the Bankruptcy Code, for the benefit of Lender, and the super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations, as provided in Section 6.3 and approved by the Financing Order.

"**Cash**" means money, currency or the available credit balance in dollars in a Deposit Account.

"**Cash Shortfall**" means, for any period, the amount that (a) Cash requirements of Borrower for the categories of expenses and costs included in the Approved Budget exceed (b) Cash collections received by Borrower that are available for use by Borrower in the Ordinary Course of Business.

"**Chattel Paper**" shall have the same meaning ascribed to such term in the UCC.

"**Collateral**" means collectively all of Borrower's Assets securing the Obligations of Borrower hereunder, including without limitation cash and property of Borrower in the possession of other parties as deposits or retainers (subject to the interest of the beneficiaries of such funds) and any proceeds of Collateral. Notwithstanding any other provision of any Financing Agreement to the contrary, the Collateral shall not include the right, title and interest of Borrower in the Avoidance Actions, other than Avoidance Actions pursuant to Section 549 of the Bankruptcy Code.

"**Collateral Account**" means an account satisfactory to Lender in its sole discretion and which is in the name of Borrower over which Lender has "control" as defined in the UCC.

"**Committee**" means the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Bankruptcy Case and each of such committees shall be referred to herein as a Committee.

"**Daily Balance**" means the amount of the Obligations owed at the end of a given day.

"**Deposit Account**" shall have the meaning ascribed to such term in the UCC.

"**Documents**" shall have the meaning ascribed to such term in the UCC.

"**Effective Date**" means the date established as provided in Section 3.1 of this Agreement.

"**Equipment**" means in addition to the definition of equipment in the UCC all of Borrower's present and hereafter acquired equipment, furniture, furnishings, fixtures, goods (other than consumer goods or farm products) and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"**Event of Default**" means any event specified in Section 8.

"**Extraordinary Receipts**" means Net Cash Proceeds received from the payment of insurance losses or claims, tax refunds, indemnification payments, Disproportionate Share Hospital payments ("DSH Payments"), or any other source other than the sale of goods and services in the Ordinary Course of Business.

"**Financial Assets**" shall have the meaning ascribed to such term in the UCC.

"**Financing Agreements**" shall mean, collectively, this Agreement, the Financing Order, the Asset Purchase Agreement, and all notes, security agreements, Approved Budgets, Advance Requests, and any other agreements, schedules, Documents and instruments now or at any time hereafter executed and/or delivered by Borrower in connection with this Agreement or the Asset Purchase Agreement, as each of the same now exists or hereafter may be supplemented, amended, extended, renewed, restated, superseded or replaced.

"**Financing Commitment**" means the commitment of Lender to make Advances up to an aggregate principal amount that shall not exceed one million dollars ($1,000,000) or such lesser amount as is set forth in the Financing Order, and subject at all times to the provisions of this Agreement and the other Financing Agreements.

"*Financing Conditions*" means the conditions (precedent and subsequent) to the Lender's obligations under this Agreement as set forth in Section 3.

"*Financing Order*" means the Bankruptcy Court Order that, among other matters but not by way of limitation, authorizes (a) the Borrower to obtain credit, and incur (or guaranty) indebtedness, (b) this Agreement, (c) the Asset Purchase Agreement, (e) the granting to Lender of super-priority, priming, first priority liens in the Collateral; (e) the granting of super-priority administrative expense status of Lender's claims, and (f) the granting of other liens, interests, priority claims and rights in favor of Lender in the Collateral pursuant to the Financing Agreements, on an emergency, interim, final or other basis.

"*Financing Procedures*" means the procedures required in connection with the making of Advances as set forth in Section 4.

"*General Intangibles*" means, in addition to the definition of general intangibles in the UCC, all of Borrower's present and future general intangibles and other personal property (including goodwill, trade secrets, patents, patent applications, copyrights, trade names, trademarks, service marks, blueprints, drawings, purchase orders, customer lists, infringement claims, computer programs, computer discs, computer tapes, Borrower's Books, literature, reports, catalogs, insurance premium rebates, tax refunds, and tax refund claims) other than goods and Accounts.

"*Governmental Authority*" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"*Hospital*" means Community Hospital of Huntington Park.

"*Instruments*" shall have the meaning ascribed to such term in the UCC.

"*Inventory*" means, in addition to the definition of inventory in the UCC, all present and future inventory in which Borrower has any interest, including goods held for sale or lease or to be furnished under a contract of service, Borrower's present and future raw materials, work in process, finished goods, tangible property, stock in trade, wares, and materials used in or consumed in Borrower's business, goods which have been returned to, repossessed by, or stopped in transit by Borrower, packing and shipping materials, wherever located, any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

"*Investment Property*" means, in addition to the definition of investment property in the UCC, all Equity Interests.

"*Liens*" means all liens, security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in section 101(5) or "lien" as defined in section 101(37) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases,

licenses, options, rights of first refusal, contracts, offsets, recoupment, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, licenses, options, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including without limitation to the generality of the foregoing restrictions or conditions on or to the transfer, assignment, or renewal of licenses, permits, registrations, and authorizations or approvals of or with respect to governmental units and instrumentalities) to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the commencement of the Bankruptcy Case, whether imposed by agreement, understanding, law, equity or otherwise.

"*Material Adverse Change*" means a material adverse change in (a) Borrower's ability to pay or perform its Obligations in accordance with the terms of the Financing Agreements, or (b) the validity or enforceability of the Financing Order or any of the other Financing Agreements, or (c) the rights and remedies of Lender under the Financing Order and the other Financing Agreements.

"*Maturity Date*" means the date specified in Section 2.5 of this Agreement.

"*Negotiable Collateral*" means all of Borrower's present and future letters of credit, notes, drafts, instruments, documents, leases and Chattel Paper.

"*Net Cash Proceeds*" means, with respect to any Asset disposition or sale the aggregate cash, or other payment in kind, goods or services, and any proceeds thereof received by or for the benefit of Borrower from such Asset disposition or sale (including, without limitation, cash received by way of deferred payment pursuant to a note receivable, conversion of non-cash consideration, cash payments in respect of purchase price adjustments or otherwise, but only as and when such cash is received and excluding any deferred payment pursuant to any non-cash consideration to the extent such payment represents interest income to Borrower) minus (a) the direct costs and expenses incurred in connection therewith (including in the case of any Asset disposition or sale, the payment of the outstanding principal amount of, premium, if any, and interest on any Indebtedness (other than hereunder) required to be repaid as a result of such Asset disposition or sale); (b) any provision for taxes in respect thereof made in accordance with GAAP; provided that such expenses shall only include taxes to the extent that taxes are payable in cash in the current year or the following year as a result of such Asset disposition or sale; and (c) any portion of any such proceeds which Borrower determines in good faith should be reserved for post-closing adjustments (to the extent Borrower delivers to Lender a certificate signed by the senior financial officer of Borrower as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than three months following the date of the respective asset disposition or sale), the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds

the actual post-closing adjustments payable by Borrower shall constitute Net Cash Proceeds on such date received by Borrower. Any proceeds received in a currency other than dollars shall, for purposes of the calculation of the amount of Net Cash Proceeds, be in an amount equal to the dollar equivalent thereof as of the date of receipt thereof by such Person.

"*Note*" means the promissory note, substantially in the form of Exhibit B hereto, made by Borrower to the order of Lender concurrently herewith or at any time hereafter.

"*Obligations*" means all loans, advances, including, but not limited to Advances, and any overadvances, debts, liabilities, obligations, covenants, and duties owing by Borrower to Lender of any kind and description in connection with any Financing Agreements, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Borrower to others which Lender may obtain by assignment or otherwise, and all interest thereon.

"*Ordinary Course of Business*" means the ordinary course of business consistent with the standards, policies and practices of Borrower in the operation of the Hospital in compliance with applicable laws.

"*Payment Intangibles*" means all "payment intangibles" as such term is defined in the UCC, now owned or hereinafter acquired by any Person, including a General Intangible under which an Account debtor's principal obligation is a monetary obligation.

"*Person*" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof) and shall include such Person's successors and assigns.

"*Petition Date*" means the date of the initial filing of the Bankruptcy Case.

"*Post-Petition*" means the time period beginning immediately after the filing of the Bankruptcy Case.

"*Pre-Petition*" means the time period ending immediately prior to the filing of the Bankruptcy Case.

"*Prohibited Payment*" means any of the following payments, whether in cash or in kind, directly or indirectly: (a) payments that are prohibited by law; (b) payments to any Prohibited Person; or (c) payments of Administrative Fees and Expenses, even if approved by the Bankruptcy Court; or (d) payments to cover any Cash Shortfall resulting from Borrower making any of the Prohibited Payments described in the foregoing clauses (a) through (c).

"*Prohibited Person*" means any of the following Persons: (i) Edward Rubin or Mitchell Rubin; (ii) any immediately family member of either Edward Rubin or Mitchell Rubin; (iii) any trust if any beneficiary of such trust is Edward Rubin, Mitchell Rubin, or any immediate family

member of either Edward Rubin or Mitchell Rubin; (iv) any Affiliate of either Edward Rubin or Mitchell Rubin, or of any of their respective immediately family members; (v) any shareholder or holder of any other voting or Equity Interest of, and any director, officer, agent or employee of, Borrower; and (vi) any Affiliate of Borrower, or any of its respective agents, employees or holders of voting or other Equity Interests. For purposes of the foregoing, an immediate family member shall include a Person's parents, siblings, spouse and descendants (whether by birth, marriage of adoption), and any trust if any beneficiary of such trust is the Person and/or the Person's parents, siblings, spouse and/or descendants.

"*Restricted Cash*" at any time, means an amount equal to the book balance amount of outstanding checks written by Borrower plus two hundred fifty thousand dollars ($250,000).

"*Senior Lender*" means Seimens Financial Services, Inc.

"*Term*" means the period from the Effective Date through and including the Termination Date.

"*Termination Date*" means the date upon which this Agreement is terminated pursuant to Section 9 or as otherwise provided in this Agreement.

"*Total Cash*" at any time, means the actual amount of Cash, excluding cash in the Collateral Account, held by Borrower.

"*UCC*" means California's codification of the Uniform Commercial Code.

"*Variance Report*" shall mean a report to be delivered by Borrower to Lender in form and substance satisfactory to Lender, on a weekly basis (commencing on the second Wednesday after the entry of the Financing Order) reflecting without limitation, the following: (i) the actual cash receipts and disbursements on a line item basis for the preceding week and (ii) the actual cash receipts and disbursements on a cumulative basis since the Petition Date, (iii) the Cash Shortfall for the week and on a cumulative basis, (iv) the Cash Flow Sweep Amount for the week, the dollar amount and percentage variance of such amounts from those set forth in the Approved Budget for such preceding week and (v) containing a narrative analysis of Borrower's performance for the preceding week and any line-by-line variance from such period in the Approved Budget.

## 2. TERMS OF FINANCING COMMITMENT.

*2.1 Financing Commitment.* Subject to and in accordance with the provisions of this Agreement, Lender agrees from time to time during the Term hereof to make Advances to Borrower in accordance with the Approved Budget, provided, however that the aggregate principal amount of all such Advances shall not exceed the Financing Commitment.

*2.2 Effective Date.* This Agreement shall become effective upon (a) entry of the Financing Order in a form satisfactory to Lender in all respects (to be effective immediately, with no ten day stay), (b) execution by Lender, and (c) satisfaction of the Financing Conditions

and the Financing Procedures (the *"Effective Date"*), and thereafter shall continue through the Termination Date, subject to termination as provided herein. This Agreement may be extended by mutual written agreement of the Parties.

**2.3     Use of Proceeds.** Borrower shall use the proceeds of each Advance for the sole purpose of paying (a) operating expenses that are essential for the provision of Hospital patient care services in the Ordinary Course of Business, provided such essential operating expenses are set forth in the Approved Budget that has been approved by Lender as required hereunder; and (b) Lender fees and expenses associated with this Agreement, as provided in Section 10. Without limiting the foregoing, Borrower shall not, and nothing in the Financing Agreements or the Financing Order is intended or shall be construed to authorize or permit Borrower to, use any of the proceeds of any Advance for the payment of any of the Prohibited Payments.

**2.4     Interest.** Except where specified to the contrary in the Financing Agreements, the outstanding principal balance of the Advances shall bear interest at the fixed rate of ten percent (10%) per annum. After the occurrence of and during the continuation of an Event of Default, the Obligations shall accrue interest, at the applicable rate for each Advance outstanding plus five percent (5.00%) (the *"Default Rate"*). All interest payable under the Financing Agreements shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed on the Daily Balance. Interest as provided for herein shall be paid monthly, and in any event shall continue to accrue until the Obligations are indefeasibly paid in full. Should any provision of this Agreement or any Financing Agreements between the Parties be construed to require the payment of interest or any other fees or charges which could be construed as interest which, together with any other charges upon the principal or any portion thereof and any other fees or charges which could be construed as interest, exceeds the maximum lawful rate of interest, then any such excess shall be applied against the remaining principal balance of the Advances, and the remainder, if any, refunded to Borrower.

**2.5     Maturity Date.** The Obligations shall mature and become and be absolutely due and payable by Borrower to Lender upon the earliest to occur of the following: (a) the effective date of the Asset Sale; and (b) the expiration of one hundred twenty (120) days following the Effective Date of this Agreement.

**2.6     Acceleration of Maturity.** Notwithstanding Section 2.5, the Obligations shall become and be absolutely due and payable by Borrower to Lender upon the earliest to occur of the following: (a) on the date that is ten (10) days after the date of delivery of notice of the termination of the Asset Purchase Agreement by Lender, except, if such termination shall be attributable to a material breach by the Borrower; (b) immediately upon termination of the Asset Purchase Agreement by Lender as a result of a material breach by Borrower of such agreement; (c) the date of termination in whole of the Financing Commitment pursuant to the terms of this Agreement, including pursuant to an exercise of remedies pursuant to Section 9; (d) the effective date of a sale of substantially all of Borrower's Assets to any Person other than Lender pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n) and 365 of the Bankruptcy Code; (d) immediately upon confirmation of a plan of reorganization that is inconsistent with this Agreement or the Asset Purchase Agreement; (e) immediately upon dismissal of the Bankruptcy Case; and (f) immediately upon the conversion of the Bankruptcy Case to a Chapter 7 case.

**2.7** **_Payments Generally_**. Any prepayment in whole or in part shall include accrued interest and all other sums then due hereunder. No partial prepayment shall affect the obligation of Borrower to make any payment of principal or interest hereunder on the due dates specified. All payments made by Borrower under this Agreement and the other Financing Agreements shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes, gross receipt taxes (imposed in lieu of net income taxes) and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Financing Agreement).

**2.8** **_Voluntary Payment_**. The Borrower shall have the right (a) from time-to-time, to prepay all or any part of the outstanding principal balance without premium or penalty in accordance with the Approved Budget, or (b) at any time, to indefeasibly pay in full all of the Obligations without premium or penalty.

**2.9** **_Mandatory Payments_**. Except to the extent expressly set forth in the Approved Budget, to the extent Borrower realizes any Net Cash Proceeds from a sale of Assets other than pursuant to the Asset Sale, or from Extraordinary Receipts (including but not limited to, DSH Payments), (a) one hundred percent (100%) of all such Net Cash Proceeds shall be deposited in the Collateral Account on the date received; (b) if an Event of Default has occurred, all such Net Cash Proceeds deposited in the Collateral Account shall be applied against the outstanding Obligations; and (c) if an Event of Default has occurred, the foregoing mandatory payments shall be applied first to the fees and expenses of the Lender until paid in full, second to the accrued but unpaid interest and third to reduce the principal of the Advances then outstanding.

**2.10** **_Application of Collateral Account Funds_**. If an Event of Default has occurred, all funds in the Collateral Account shall be first applied to reduce the aggregate amount of the Advances outstanding and after all Advances have been repaid in full, shall be held as cash collateral for the Obligations.

## 3. CONDITIONS TO LENDER OBLIGATIONS.

Lender shall have no obligation under this Agreement unless and until each of the following conditions (which shall be conditions both precedent and subsequent) is and continues to be during the Term hereof, fully satisfied as determined by Lender in its sole discretion (the **_"Financing Conditions"_**):

**3.1** **_Financing Order_**. Lender shall have approved in its sole discretion, and the Bankruptcy Court shall have duly approved and entered in the Bankruptcy Case, and Borrower shall have delivered to Lender certified copies of, the Financing Order, which among other

matters but not by way of limitation, authorizes (a) this Agreement, (b) the Asset Purchase Agreement, (c) the granting to Lender of super-priority, priming, first priority liens in the Collateral; (d) the granting of super-priority Administrative Expense status of Lender's claims, and (e) the granting of other liens, interests, priority claims and rights in favor of Lender as provided in the Financing Agreements.

**3.2  Obligations to Senior Lender.** Lender shall have obtained the prior written approval of the Senior Lender to the performance by Lender of its obligations under this Agreement and the Financing Agreements, and the performance by Lender of its obligations hereunder shall not constitute a default by Lender under any agreement with Senior Lender.

**3.3  Financing Agreements.** Borrower shall have duly approved, caused to be signed by an Authorized Officer of Borrower, and delivered to Lender, the Financing Agreements, each in form and substance satisfactory to Lender in its sole discretion, including but not limited to, the Asset Purchase Agreement, and a Note of Borrower in favor of Lender substantially in the form set forth as Exhibit B attached hereto.

**3.4  Lender Approval of Budget.** Borrower shall have obtained from Lender its prior written approval of each Approved Budget, including each line item expense set forth therein, which approval Lender may give, condition or withhold in its sole and absolute discretion. Without limiting the foregoing, under no circumstances shall an Approved Budget include any Prohibited Payment.

**3.5  Lender Security.** Lender's Liens on the Collateral under Section 364(d) of the Bankruptcy Code, for the benefit of Lender, and the super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be in full force and effect.

**3.6  No Event of Default.** No Event of Default hereunder, and no breach by Borrower of its obligations under the Asset Purchase Agreement or any of the Financing Agreements, shall have occurred or be continuing at any time during the Term of this Agreement.

**3.7  No Legal Impairments.** The Financing Order shall be in full force and effect, and shall not have been amended, superseded, stayed, vacated, voided, challenged, subject to appeal or otherwise impaired in legal effect, and all of the rights of Lender as authorized by the Financing Order, including but not limited to, Lender's Liens on the Collateral under Sections 364(d) of the Bankruptcy Code, for the benefit of Lender, and the super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations, shall be valid, in full force and effect, and shall not have been amended, superseded, stayed, vacated, voided, challenged, subject to appeal or otherwise impaired in legal effect.

**3.8  No Legal Impediments.** No action, suit, claim, investigation, or legal, administrative or other proceeding (including any hearing or proceeding in the Bankruptcy Court), shall be pending or threatened that would if successful prevent the performance by Lender of its obligations hereunder, the impairment or invalidity of Lender's Liens on the Collateral under Sections 364(d) of the Bankruptcy Code, for the benefit of Lender, and the

super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations, or the exercise by Lender of any of its rights provided hereunder.

**3.9     No Violation of Law.**  The performance by either Party of its obligations, and the exercise by either Party of its rights, under the Financing Agreements, does not violate any applicable law, regulation, administrative order, order of any court or other Governmental Authority on the date of or immediately following such action.

**3.10     Consents.**  Borrower shall have received all consents and authorizations required pursuant to any material contractual obligation with any other Person and shall have obtained all approvals of, and effected all notices to and filings with, any Governmental Authority, in each case, as may be necessary to allow Borrower lawfully (a) to execute, deliver and perform, in all material respects, its obligations hereunder and under the other Financing Agreements, and (b) to create and perfect the Liens on the Collateral in the manner and for the purpose contemplated by the Financing Agreements.

**3.11     Officer's Certificate.**  Borrower shall have provided to Lender a certificate of the Secretary or an Assistant Secretary of Borrower certifying (i) the names and true signatures of each corporate officer that has been authorized to execute and deliver any Financing Agreement or other document required hereunder to be executed and delivered by or on behalf of the Borrower, and (ii) the resolutions of Borrower's Board of Directors approving and authorizing the execution, delivery and performance of this Agreement and the other Financing Documents to which it is a party.

**3.12     Financing Conditions and Procedures.**  Borrower otherwise shall have complied with all of the Financing Conditions and Financing Procedures required by this Agreement.

## 4.     ADVANCE PROCEDURES.

In addition to the Financing Conditions, Lender's obligations to make Advances under this Agreement are and shall continue to be during the Term hereof, subject to the satisfaction of each of the following requirements (each of which shall be a condition precedent) as determined by Lender in its sole discretion (the "**Financing Procedures**"):

**4.1     Advance Request.**  All requests for Advances (a) shall be delivered to Lender by Borrower; (b) shall be made pursuant to a written Advance Request in such form and having such content as may from time to time be  reasonably required by Lender; (c) shall specify the amount of the requested Advance and the date on which such Advance is to be made (which day shall be a Business Day at least three (3) Business Days after the request of such Advance, other than the initial advance which shall be delivered on the Effective Date); (d) shall be for an amount not to exceed the amount for such Advance set forth in the Approved Budget; (e) shall be signed by an Authorized Officer of Borrower, who shall certify that (i) all of the conditions set forth in Section 2 of this Agreement have been satisfied and that (ii) no event has occurred that would constitute an Event of Default hereunder, whether or not with the giving of notice or the passage of time; and (f) shall be accompanied by (i) the Approved Budget or any update thereto then due which has not been previously delivered, (ii) all Variance Reports then due and

not previously delivered, (iii) evidence satisfactory to Lender that the insurance policies required by the Financing Agreements are in full force and effect, together with endorsements naming Lender as an additional insured or loss payee under all insurance policies to be maintained with respect to Borrower, and (iv) such other certificates, documents, agreements and information respecting Borrower as Lender may reasonably request.

**4.2    *Frequency of Advances*.** Lender shall have no obligation to make Advances pursuant to this Agreement more frequently than one (1) per week.

**4.3    *Amount of Advances*.** Advance Requests shall be for Advances in the minimum amount of fifty thousand dollars ($50,000) and minimum additional increments of fifty thousand dollars ($50,000), provided, however, that the amount of any Advance shall not exceed the lesser of (a) an amount equal to (i) the aggregate weekly amounts of Cash Shortfall on a cumulative basis from the Effective Date through the date of determination minus (ii) the aggregate amount outstanding of all Advances made to Borrower hereunder from the Effective Date through such date of determination, and (b) the actual weekly amounts of Cash Shortfall as indicated in the current Variance Report as of the time of any request for an Advance, and, in each case, shall not at any time exceed the Financing Commitment.

**4.4    *Effect of Advance Request*.** Each submission by Borrower of an Advance Request and the acceptance by Borrower of the proceeds of each Advance requested therein shall be deemed to constitute a representation and warranty by Borrower as to the matters specified in Section 2 and this Section 4 on the date of the submission of the Advance Request and the making by Lender of such Advance. All Advances made under this Agreement shall be conclusively presumed to have been made to, at the request of, and for the benefit of Borrower when deposited to the credit of Borrower or otherwise disbursed in accordance with the instructions of Borrower or in accordance with the terms and conditions of this Agreement.

**4.5    *Making of Advance*.** Unless otherwise requested by Borrower, all Advances shall be made by a wire transfer to the deposit account designated by Borrower from time to time to the Lender in a written notice.

## 5.    REPRESENTATIONS AND WARRANTIES.

Borrower acknowledges, represents and warrants to Lender as of the Effective Date, and the date of each Advance Request and of each Advance made pursuant to this Agreement, each of the following:

**5.1    *Due Incorporation and Qualification*.** The Borrower is a corporation duly organized and existing under the laws of the State of California and is qualified and licensed to do business and is in good standing in any state in which the conduct of its business or its ownership of assets requires that it be so qualified, except for any failure to be so qualified or licensed as would not reasonably be expected to have a Material Adverse Effect.

**5.2    *Due Authorization*.** The Borrower has the right and power and is duly authorized by all appropriate corporate or other required action to enter into each of the Financing

Agreements to which it is a party, subject only to the Bankruptcy Court's entry of the Financing Order. Except for the Financing Order, no authorizations of, or registrations or filing with, any Governmental Authority, or any applicable securities exchange, or other third party are necessary for the execution, delivery or performance by Borrower of the Financing Agreements to which it is a party, or for the legality, validity or enforceability hereof or thereof.

**5.3** **_Executive Offices_.** The location of the executive offices of Borrower is set forth in Section 12 of this Agreement and Borrower will not, without prior written consent of Lender, relocate such offices.

**5.4** **_Inventory and Equipment_.** Borrower shall keep the Inventory and Equipment only at the Hospital or the Executive Offices, unless Inventory or Equipment are required to be moved to a different location in the Ordinary Course of Business to enable Borrower to provide its services, in which case Borrower shall notify Lender in writing of the new location of such Inventory and Equipment prior to any such relocation.

**5.5** **_Permits and Licenses_.** The Borrower holds all licenses, permits, approvals and consents required for the conduct of its Hospital business and the ownership and operation of its Assets, except as would not be reasonably expected to have a Material Adverse Effect.

**5.6** **_Due Execution; Binding Obligation_.** Upon entry by the Bankruptcy Court of the Financing Order, the execution, delivery and performance by Borrower of each of the Financing Agreements to which it is a party, have been duly executed and delivered by Borrower. This Agreement is, and each of the other Financing Agreements to which Borrower is or will be a party, when delivered hereunder or thereunder, and upon entry and subject to the terms of the Financing Order, will be, a legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and the Financing Order.

**5.7** **_The Orders_.** As of the date of the making of any Advance Request or Advance hereunder, the Financing Order has been entered and has not been amended, superseded, stayed, vacated, voided, challenged, subject to appeal or otherwise modified or impaired in legal effect or in any respect (except in accordance with the terms hereof).

**5.8** **_Compliance with Organizing Instruments_.** The execution by Borrower of the Financing Agreements to which it is a party does not constitute a breach of any provision contained in Borrower's certificate of incorporation or its bylaws, nor does it constitute a default or an event of default under any material agreement to which Borrower is now or may hereafter become a party.

**5.9** **_Financial Statements and Approved Budget_.** The financial statements that have been delivered to the Lender both prior to the Effective Date and thereafter have been prepared in accordance with GAAP, subject to year end audit adjustments and the absence of footnotes in the case of interim financial statements, and accurately and fairly present in all material respects the results of operations and financial condition of Borrower as of the date of such financial statements. The Approved Budget is based upon Borrower financial statements, and reasonable estimates and assumptions set forth therein, has been prepared on the basis of the assumptions

stated therein and reflects the reasonable estimates of Borrower of the results and needs of its operations and other information projected therein. To Borrower's knowledge after reasonable inquiry and diligence, no facts exist that individually or in the aggregate would or could reasonably be expected to result in any material change in any of the assumptions or information set forth in the Approved Budget.

*5.10    Financing Agreements.*    Each Financing Agreement and each report and document delivered pursuant to any Financing Agreement, including any financial statement, Approved Budget, Variance Report, notice or other document delivered pursuant hereto or thereto, taken as a whole and in light of the circumstances in which made, contains no untrue statement of a material fact and does not omit to state a material fact necessary to make such statements not misleading in any case, which have not been, prior to the date hereof, corrected, supplemented, or remedied by subsequent documents furnished or statements made orally or in writing to the Lender or the Bankruptcy Court (as appropriate); and, to the extent that any such written statements constitute projections or other forward-looking statements, such projections or other forward-looking statements were prepared in good faith on the basis of assumptions, methods, data, tests and information reasonably believed by Borrower to be valid and accurate in all material respects at the time such projections were furnished to the Lender, Lender or the Bankruptcy Court.

*5.11    No Material Adverse Change.*    Except as disclosed in writing to Lender prior to the date hereof, to Borrower's knowledge after reasonable inquiry and diligence there are no unstayed legal or arbitral proceedings, or any proceedings or investigation by or before any Governmental Authority, pending or threatened in writing against Borrower which is reasonably likely to be determined adversely and if so determined would have a Material Adverse Change or that seek to enjoin or delay any of the transactions contemplated hereby.

*5.12    Use of Proceeds.* All proceeds provided by Lender to Borrower pursuant to any Financing Order, this Agreement or otherwise, have been and shall be used by Borrower solely for the purposes expressly set forth in this Agreement, and shall not have been used for any Prohibited Payments.

*5.13    No Event of Default.*    No Event of Default under this Agreement, or breach of any of the Financing Agreement, has occurred or is continuing.

*5.14    Lender Security.*    Upon the entry of the Financing Order and subject to the Carve Out, the Obligations shall at all times constitute an Administrative Expense for which Lender shall at all times maintain and have a super-priority claim pursuant to Section 364(c) of the Bankruptcy Code, maintain and have a lien on the Collateral pursuant to Section 364(d) of the Bankruptcy Code, and no other party has or shall have a lien or claim that is *pari passu* or superior to the claim of Lender.

*5.15    Right to Inspect.*    Lender and Persons designated by Lender (including without limitation examiners or other representatives of Senior Lender) shall have the right, as reasonable, at any time or times hereafter during Borrower's usual business hours (or at any time after the occurrence and during the continuation of an Event of Default), or, as applicable, to the

extent that Borrower has the contractual ability to grant Lender such rights, during the usual business hours of any third party having control over Borrower's Books, to inspect Borrower's Books, facilities and operations in order to verify the amount or condition of, or any other matter relating to, the Financing Agreements, Obligations or Borrower's financial condition or operations.

**5.16    Title to Assets; Liens.** Borrower owns and has on the date hereof good and marketable title, subject to reclamation rights with respect to Inventory, or subsisting leasehold interests subject to Liens permitted hereunder to, and enjoys on the date hereof peaceful and undisturbed possession of, all Assets and such material properties that are necessary for the operation and conduct of its businesses. There are no Liens of any nature whatsoever on any Assets of Borrower other than: (i) Liens granted pursuant to the Financing Order and this Agreement; and (ii) the Liens in existence on the Petition Date as disclosed to Lender. The aggregate indebtedness or other obligations secured (or that may be secured) by each such Lien has been fully disclosed to Lender and Borrower has no other indebtedness for borrowed money. Borrower is not party to any contract, agreement, lease or instrument entered into on or after the Petition Date the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a Lien on any Assets of Borrower in violation of this Agreement.

# 6.    LENDER SECURITY.

**6.1    Security for Obligations.** This Agreement and the Collateral secure the indefeasible payment in full and performance of the Obligations.

**6.2    Super-priority Nature of Obligations; Priming Lien.** The Obligations shall be secured by Liens in the Collateral under Sections 364(d) of the Bankruptcy Code.  The Obligations shall have the status in the Bankruptcy Case of super-priority administrative expenses under Section 364(c)(1) of the Bankruptcy Code. Such administrative claim shall have priority, subject to Section 6.3 below, over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower, Borrower's estate, and any successor trustee or estate representative in the Bankruptcy Cases or any subsequent proceeding or case under the Bankruptcy Code.

**6.3    Carve Out.** Subject to the provisions of the Financing Order, the Approved Budget and this Section 6.3, and provided that no Event of Default has occurred and is continuing, Lender's Liens on the Collateral under Sections 364(d) of the Bankruptcy Code, for the benefit of Lender, and the super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject only to the payment of the following Carve Outs:  (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a) of title 28 of the United States Code, (b) all fees that are required in connection with the Ombudsman, and (c) the professional fees and disbursements incurred by Borrower in connection with this Agreement, and the application for the Financing Order, but such professional fees and disbursements in the aggregate shall not exceed seventy five thousand dollars ($75,000); provided, however, that any payments actually

made to such professionals shall reduce dollar-for-dollar the Carve-Out; provided, further, that in no event shall any of the Carve-Out be utilized to prosecute or cause others to prosecute any Adverse Claims. Notwithstanding anything to the contrary set forth herein, the Carve Out shall not include any other claims that are or may be senior to or *pari passu* with any of the Carve Out or any professional fees and expenses of a Chapter 7 trustee and, provided, further, that the Carve Out shall not include any fees or disbursements arising after the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code. Payment of any fees or expenses under the Carve Out by Lender shall not and shall not be deemed to reduce the Obligations, and shall not and shall not be deemed to subordinate any of Lender's liens and security interests in the Collateral or the super-priority claims to any junior pre- or post-petition lien, interest or claim in favor of any other party. Except as otherwise provided herein with respect to the Carve-Out, Lender shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the Chapter 11 Case under any chapter of the Bankruptcy Code, and nothing in this Financing Order shall be construed to obligate Lender in any way, to pay compensation to or to reimburse expenses of any professional, or to ensure that Borrower has sufficient funds to pay such compensation or reimbursement. No costs or expenses of administration shall be imposed against Lender or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise.

  **6.4 *Grant of Security Interest*.** The Borrower hereby grants and pledges to Lender for the benefit of Lender, a pledge and security interest in all of Borrower's right, title and interest in and to all of Borrower's Assets, now existing or hereafter acquired, including without limitation, the Collateral and each of the items of collateral set forth below, which pledge and security interest shall be subject to the priorities set forth in Section 6 of this Agreement and the Financing Order:

   (a) all Accounts;
   (b) all Cash;
   (c) all Inventory, subject to reclamation rights;
   (d) all Equipment;
   (e) all General Intangibles;
   (f) all rights and interests of Borrower, now existing or hereafter arising and however and wherever arising, in respect of any and all (i) notes, drafts, letters of credits, stocks, bonds, and debt and equity securities, whether or not certificated; (ii) money (including all cash and cash equivalents held in the Collateral Account); and (iii) proceeds of loans, including, without limitation, Advances made under this Agreement; together, in each instance, with all accessions and additions thereto, substitutions therefor, and replacements, proceeds and products thereof;
   (g) all books, records, ledger cards and other property at any time evidencing or relating to the Collateral;
   (h) Extraordinary Receipts received after the Petition Date; and
   (i) all proceeds and products of any of the foregoing, in any form.

  **6.5 *Financing Statements*.** Borrower hereby authorizes the Lender to file one or more initial financing or continuation statements (including the description of the Collateral as "all

assets" or "all personal property" and "all after acquired property or assets" of Borrower), and amendments thereto, relative to all or any part of the Collateral without the signature of Borrower.

**6.6** *Appointment of Attorney-in-Fact.* The Borrower hereby irrevocably appoints the Lender, for its benefit and the benefit of Lender, such Borrower's attorney-in-fact (which appointment shall be irrevocable and deemed coupled with an interest), with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in the Lender's discretion, upon and during the occurrence and continuation of an Event of Default in accordance with Section 9 of this Agreement and the Financing Order, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation: (a) to obtain and adjust insurance required to be paid to the Lender; (b) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (c) to receive, endorse, and collect any drafts or other instruments, documents and Chattel Paper, in connection with clause (a) or (b) above; (d) to receive, endorse and collect all instruments made payable to Borrower representing any dividend or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same; and (e) to file any claims or take any action or institute any proceedings which the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

## 7.    BORROWER COVENANTS.

The Borrower covenants and acknowledges that until the Obligations are indefeasibly paid in full and performed, unless Borrower has obtained the prior written consent of Lender, Borrower shall comply with all of the following:

**7.1** *Notices and Other Reports.* The Borrower shall provide to Lender, with a copy to the counsel for the Committee, and counsel for CHHP, Inc, Huntington Park Doctors Group, LLC and Cardinal Health each of the following:

(a)    written notice of the occurrence of any Event of Default under this Agreement or breach under any other Financing Agreement;

(b)    prior written notice of any motion, order or other information or document filed by Borrower with the Bankruptcy Court or distributed or made available to the Committee;

(c)    as soon as available and in any event no later than fifteen (15) days after the end of each month, copies of monthly financial statements;

(d)    as soon as available and in any event no later than three (3) Business Days after the end of each weekly period, a Variance Report accompanied by a certificate of an Authorized Officer of Borrower, in form and substance satisfactory to Lender, as of the last day of the preceding weekly period, setting forth the following information for Borrower for the preceding weekly period on both a weekly and cumulative basis from the Effective Date to such date, on a cash basis: (i) total disbursements, (ii) total cash receipts, (iii) comparative numbers from the Approved Budget, and (iv) the weekly Cash Shortfall, the cumulative Cash Shortfall;

(e)    at the of each week Borrower will provide an update to Lender of the Approved Budget in a form satisfactory to Lender; and

(f)     any other information reasonably requested by Lender.

**7.2    _Compliance with Bankruptcy Court_.** The Borrower shall comply with the notice and other requirements of the Bankruptcy Code and all other applicable rules in a manner acceptable to Lender and its counsel.

**7.3    _Compliance With Law_.** The Borrower shall comply, in all material respects, with the requirements of all applicable laws, rules, regulations and orders of Governmental Authorities relating to Borrower and the conduct of its business.

**7.4    _Use of Cash Collateral_.** Until the Obligations are indefeasibly paid in full and the Financing Commitments have been terminated, Borrower shall use any Cash Collateral permitted to be used by Borrower pursuant to the Financing Order, excluding Restricted Cash, solely in accordance with the Approved Budget notwithstanding the timing of receipt of cash or levels of cash balances.

**7.5    _Maintenance of Assets_.** The Borrower shall keep and maintain its real property, Assets, including the Inventory and Equipment and other Assets in good operating condition and repair, ordinary wear and tear excepted, and shall make all necessary repairs or replacements thereto so as to maintain and preserve the same as necessary in the conduct of Borrower's Hospital business.

**7.6    _Insurance_.** The Borrower shall keep and maintain the Assets insured against all risk of loss or damage from fire, theft, vandalism, and all other hazards and risks of physical damage included within the meaning of the term "extended coverage" in such amounts as are ordinarily insured against by similar businesses and, in each case, in such amounts and scope of coverage as is otherwise satisfactory to Lender. The Borrower shall also keep and maintain general liability insurance and property damage insurance, and insurance against loss from business interruption, insuring against all risks relating to or arising from Borrower's ownership and use of the Assets and the operation of its business. The Borrower shall not be required to maintain earthquake insurance. The Borrower shall deliver to the Lender prior to the Effective Date a standard ACCORD Evidence of Insurance Certificate evidencing insurance policies maintained by Borrower and naming the Lender as additional insured for all liability policies and as loss payee for all property damage and business interruption insurance.

**7.7    _Taxes_.** All Federal, state and local assessments and taxes, whether real, personal or otherwise, due or payable by, or imposed, levied or assessed against Borrower or any of their assets or in connection with the ownership or operation of the Hospital shall hereafter be paid before they become delinquent or before the expiration of any extension period except for those taxes, assessments and the like being contested by Borrower in good faith and by appropriate proceedings and as to which Borrower has established appropriate reserves in accordance with GAAP, provided, that no Lien is placed on any assets of Borrower during any such contest as a consequence of the failure to pay such tax, assessment or the like. The Borrower shall make due and timely payment or deposit of all such federal, state and local taxes, assessments or contributions required of it by law.

*7.8* ***Extraordinary Transactions***. Except with the prior written consent of Lender, Borrower shall not (a) suspend or go out of business, (b) enter into any acquisition, merger, consolidation or amalgamation, or (c) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or (d) form any subsidiaries, or (e) convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or Assets, or (f) make any material change in its present method of accounting, or (g) make any material change in its financial structure, business operations, or present method of conducting business, or (h) enter into any transaction not in the Ordinary Course of Business, including but not limited to the sale, lease, disposal, movement, relocation or transfer, whether by sale or otherwise, of, or grant any Lien on, any its Assets, other than the sale of Inventory in the Ordinary Course of Business or as otherwise expressly permitted by this Agreement and set forth in the Approved Budget or in any Asset sale approved by Lender; (i) incur any indebtedness for borrowed money or any other indebtedness (other than trade payables in the Ordinary Course of Business and Pre-Petition indebtedness existing on the date hereof), except as expressly approved by the Bankruptcy Court and Lender; or (j) declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of capital stock, or set apart any sum for the aforesaid purposes, or (k) sell or transfer any property or assets to, or otherwise engage in any other transactions with, any of its shareholders, directors or officers.

*7.9* ***Payments***. Except with the prior written consent of Lender, Borrower shall not pay any Post Petition indebtedness owing to any third party, or pay any Pre-Petition indebtedness or settle any claim relating thereto, other than expenses in the Approved Budget, or as otherwise ordered by the Bankruptcy Court (e.g., allowed reclamation claims, pre-petition wages, shipper's or warehouse lien claims, if any, etc.).

*7.10* ***Bankruptcy Case***. Except with the prior written consent of Lender, Borrower shall not (a) convert the Bankruptcy Case to a liquidation, or (b) seek, consent or suffer to exist: (i) any modification, stay, vacation or amendment to any Financing Order, unless Lender has consented to such modification, stay, vacation or amendment in writing, or (ii) a priority claim for any administrative expense or unsecured claim against Borrower, or any other super-priority administrative expense claim which is pari passu with or senior to the claims of Lender against Borrower, or (c) enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000.

## 8. EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an Event of Default by Borrower hereunder:

**8.1    *Failure to Pay*.** The Borrower's failure to pay when due and payable, including when declared due and payable, or within one (1) Business Day after receipt of written notice from the Lender of such failure, any amounts or any portion of the Obligations (whether principal, interest, taxes, or otherwise).

**8.2    *Failure to Perform*.** The failure of Borrower to perform, keep or observe any term, provision, condition, representation, warranty, covenant or agreement (including any Financing Conditions and Financing Procedures) contained in this Agreement, the Asset Purchase Agreement, or in any of the other Financing Agreements, including the Financing Order, or in any other present or future agreement between Borrower and Lender, or any other order of the Bankruptcy Court and such failure shall continue for five (5) Business Days after written notice of such failure from the Lender to Borrower.

**8.3    *Misrepresentation*.** Any warranty, representation, statement or report made in this Agreement, or in any of the other Financing Agreements, including the Financing Order, or in the Asset Purchase Agreement, or in any other present or future agreement between Borrower and Lender, or in any other order of the Bankruptcy Court with respect to the Financing Order, in each such case made by Borrower or any Authorized Officer, employee, or agent of Borrower, contains a material misstatement or material misrepresentation on the date such warranty, representation, statement or report is given or made.

**8.4    *Prohibited Payments*.** Borrower makes any Prohibited Payment.

**8.5    *Material Adverse Change*.** There is a Material Adverse Change.

**8.6    *Injunction Against Borrower*.** Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business.

**8.7    *Proceedings in the Bankruptcy Case*.** The occurrence of any of the following in the Bankruptcy Case:

(a)    Borrower shall bring a motion or take any action or file any plan of reorganization or liquidation, or disclosure statement attendant thereto: (i) to obtain additional financing not otherwise permitted pursuant to this Agreement; (ii) to grant any lien upon or affecting any Collateral; (iii) except as provided in the Financing Order, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (iv) any other action or actions directly adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; or

(b)    Borrower files a plan of reorganization or a motion for the sale of a material portion of its Assets pursuant to Section 363 of the Bankruptcy Code which does not provide for indefeasible payment of the Obligations on the effective date thereof, or as otherwise agreed by Lender in writing, and to which Lender do not consent; or

(c)    An order is entered confirming a plan of reorganization or a sale of all or substantially all of the Assets of Borrower that is not approved by Lender, or does not contain a provision for termination of the Financing Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan; or

(d)     An order is entered amending, supplementing, staying, vacating or otherwise modifying the Financing Agreements or the Financing Order without the written consent of Lender; or

(e)     Other than payments permitted pursuant to this Agreement or the Financing Order, Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition indebtedness for borrowed money; or

(f)     The payment is made of, or application for authority to pay, any Pre-Petition claim without the prior written consent of Lender, unless otherwise permitted under this Agreement or pursuant to an order of the Bankruptcy Court after notice and hearing; or

(g)     Any claim or claims are allowed under Section 506(c) during the period in which the Debtor is authorized to borrow funds or use Cash Collateral under the Bankruptcy Code against or with respect to any of the Collateral or Pre-Petition Collateral, other than for the Carve Out; or

(h)     Borrower shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub clauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(i)     Except with the written consent of Lender, the Bankruptcy Court shall enter an order under Section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of a material portion of any of Borrower's Assets, or procedures in respect thereof, or Borrower shall seek, support, or fail to contest in good faith, the entry of such an order; or

(j)     The Bankruptcy Case shall be dismissed or converted from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; or

(k)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Assets of Borrower related to the Hospital which have an aggregate value in excess of $50,000.00 or (ii) to permit other actions that would have a Material Adverse Change; or

(l)     Borrower shall commence or join with or actively support the Committee or any other party in interest in the Bankruptcy Case in a suit, action or contested matter against Lender or affecting the Collateral, that sets forth (i) a claim in excess of $10,000.00, (ii) any claim or legal or equitable remedy which seeks reduction, setoff, subordination or any recharacterization of the claim or lien of Lender; or (iii) a claim that would otherwise have a material adverse effect on the rights and remedies of Lender under any Financing Agreement and related documents or the collectability of all or any portion of the Obligations; or

(m)     An order shall be entered avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement; or

(n)     (i) Borrower shall fail to comply with the terms of the Financing Order in any material respect, (ii) Borrower shall file a motion for reconsideration with respect to the Financing Order, or (iii) the right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court; or

(o)     Borrower shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (ii) granting any lien upon or affecting any Collateral which are pari passu or senior to the liens on the Collateral in favor of the Lender for the benefit of the Lender, (iii) granting any claim priority senior to or pari passu with the claims of Lender under the Financing Agreements or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, or (iv) granting any other relief that is adverse to Lender's interests under any Financing Agreement or its rights and remedies hereunder or their interest in the Collateral.

*8.8     Actions.* (a) One or more actions shall be commenced which could result in, or judgments or decrees required to be satisfied as an administrative expense claim are entered after the Petition Date against Borrower involving in the aggregate a liability (to the extent not paid or fully covered by insurance) of $50,000 or more and all such actions, judgments or decrees shall not have been vacated, stayed or bonded pending appeal within the time required by the terms of such judgment or applicable law; or (b) an action shall be commenced or there shall be rendered against Borrower a non-monetary judgment with respect to a post-Petition Date event which causes or would reasonably be expected to cause a Material Adverse Change or a suit or action against Lender is commenced by Borrower, any federal, state environmental protection or health and safety agency, any suit or action which asserts any claim or legal or equitable remedy contemplating subordination of any claim of the Lender or its affiliates, and shall remain undismissed or unstayed for thirty (30) days after its commencement without any preliminary relief of the nature sought having been granted, or it shall be determined (whether by the Bankruptcy Court or by any other judicial or administrative forum) that Borrower is liable for the payment of claims arising out of any failure to comply (or to have complied) with applicable environmental, health or safety laws or regulations.

*8.9     Variance from Approved Budget.* If, as of any date that occurs four (4) weeks or more after the Effective Date, in each case, cumulative expenses and costs (over the prior four (4) week period) exceed the amounts set forth in the Approved Budget by an amount in excess of ten percent (10%), or cumulative revenue (over the prior four (4) week period) is less than the amounts set forth in the Approved Budget by an amount in excess of twenty percent (20%).

## 9.     LENDER'S RIGHTS AND REMEDIES.

*9.1     Rights and Remedies.* Upon the occurrence and during the continuance of an Event of Default, Lender, may and at the election of Lender shall, do any one or more of the following:

(a)     declare all Obligations, whether evidenced by the Financing Agreements or otherwise, immediately due and payable in full;

(b)     cease advancing money or extending credit to or for the benefit of Borrower under the Financing Agreements or under any other agreement among Borrower, the Lender and/Lender;

(c)     terminate this Agreement as to any future liability or obligation of the Lender, but without affecting the Lender's rights and without affecting the Obligations;

(d)     recover any Prohibited Payments;

(e)     deliver to Borrower and the Committee an enforcement notice, stating that Lender will exercise their rights and remedies against the Collateral and upon delivery of such enforcement notice, Lender may file a motion to terminate the automatic stay provided in Section 362 of the Bankruptcy Code in order to enforce all of the Liens and security interests in the Collateral, enter onto any premises of Borrower in connection with an orderly liquidation of the Collateral, and exercise such other lawful rights and remedies as they deem necessary or advisable, including without limitation credit bidding for the Collateral in any sale.

*9.2     Cumulative Remedies.*  The rights, remedies, powers and privileges of Lender provided in this Section 9 are cumulative and not exclusive of any other rights, remedies, powers and privileges provided by law or equity. In addition to the foregoing, Lender shall have all rights and remedies provided by law or equity and any rights and remedies contained in any of the Financing Agreements and all such rights and remedies shall be cumulative.

*9.3     No Waiver.* No delay on the part of the Lender in exercising any right, power or privilege under any Financing Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under such Financing Agreements or otherwise, preclude other or further exercise of any such right, power or privilege.

## 10.     PAYMENT OF EXPENSES AND INDEMNIFICATION OF LENDER.

*10.1     Payment of Expenses.*  Borrower agrees to pay or reimburse Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the Note, the other Financing Agreements, the Financing Order, the Asset Purchase Agreement and any such other documents following the occurrence and during the continuance of an Event of Default, including without limitation, the reasonable fees and disbursements of counsel to Lender and professionals engaged by Lender.

*10.2     Indemnification.*  Borrower agrees to indemnify, defend, and hold harmless Lender (and its members, managers, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the Note, the other Financing Agreements, the Financing Order, the Asset Purchase Agreement any other document or agreement prepared in connection herewith or therewith or the use of the proceeds of the Advances, including without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of Borrower or any of its properties (all the foregoing, collectively, the "indemnified liabilities"), provided that Borrower shall have no obligation hereunder to Lender with respect to indemnified liabilities determined by the final non-appealable judgment of a court of competent

jurisdiction to have resulted from the gross negligence or willful misconduct on the part of Lender or its members, managers, officers, employees and agents. The agreements in this subsection shall survive repayment of the Advances and all other Obligations payable or to be performed hereunder.

   **10.3   *Payments by Lender*.** If Borrower fails to pay any monies (whether taxes, assessments, insurance premiums or otherwise) due to third persons or entities, or fails to make any deposits or furnish any required proof of payment or deposit, or fails to perform any of Borrower's other covenants under any of the Financing Agreements, then in the Lender's discretion and upon three (3) Business Days' prior notice to Borrower, Lender may do any or all of the following: (a) make any payment which Borrower failed to pay or any part thereof; (b) set up such reserves in Borrower's loan account as Lender, in its reasonable discretion, deems necessary to protect Lender from the exposure created by such failure; (c) obtain and maintain insurance policies of the type described in Section 7.6 and take any action with respect to such policies as Lender deems prudent; or (d) take any other action, in its reasonable discretion, deemed necessary to preserve and protect Lender's interests and rights under the Financing Agreements. Any payments made by Lender shall not constitute: (a) an agreement by Lender to make similar payments in the future or (b) a waiver by Lender of any Event of Default. Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance or Lien and the receipt of notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

   **10.4   *Survival*.** The agreements in this Section 10 shall survive the termination of this Agreement and the payment of the Advances and the other Obligations and all other amounts payable hereunder.

## 11.   WAIVERS.

Except as otherwise provided in the Financing Order, Borrower waives demand, protest, notice of protest, notice of payment and nonpayment, and notice of nonpayment at maturity. The Borrower hereby consents to any extensions of time of payment or partial payment at, before or after the Termination Date.

## 12.   NOTICES.

Unless otherwise provided herein, all consents, waivers, notices or demands by any party relating to the Financing Agreements shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be telecopied, personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by receipted overnight delivery service to Borrower, the Lender or to Lender, as the case may be, at their addresses set forth below:

If to Borrower:          Karykeion, Inc.
                         2623 East Slauson Ave
                         Huntington Park, CA 90255

Attn: Daniel Ansel, CRO
facsimile:
email: dansel@cmhhp.com

With a copy (which shall not constitute notice) to:

Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
Attn: Michael H. Weiss
facsimile: (424) 245-3199
mw@weissandspees.com

If to Lender:                      Avanti Health System, LLC
111 North Sepulveda Boulevard, Suite 230
Manhattan Beach, CA 90266
Attn: Seema Kamal Stewart, Esq., General Counsel
facsimile: (424) 241-1551
skamal@avantihospitals.com

With a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Attn: Samuel R. Maizel
facsimile: (310) 201-0760
smaizel@pszjlaw.com

Any party may change the address at which it is to receive notices hereunder by notice in writing in the foregoing manner given to the other parties. All notices or demands sent in accordance with this Section 12 shall be deemed received on the earlier of the date of actual receipt or five (5) calendar days after the deposit thereof in the mail or on the date telecommunicated if telecopied.

## 13.     GENERAL PROVISIONS.

*13.1    Effectiveness.* This Agreement shall be binding and deemed effective on the Effective Date.

*13.2    Successors and Assigns.* This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Agreement or any rights hereunder and any prohibited assignment shall be absolutely void. Lender reserves the right to and may from time to time and at any time without the consent of Borrower sell, assign, transfer, negotiate or grant participations in all or any part

of, or any interest in the Lender's rights and benefits hereunder. In connection therewith, Lender may disclose all documents and information which Lender now or hereafter may have relating to Borrower or Borrower's business.

**13.3    *Interpretation*.** Borrower and Lender each hereby acknowledge that (i) Borrower, and Lender jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Borrower and Lender have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby. No uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto. In addition,

      (a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

      (b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

      (c)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

      (d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

      (e)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

      (f)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

      (g)    The headings of Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

      (h)    References to any document, instrument, mortgage or agreement of any kind shall refer to any permitted amendments, restatements or other modifications thereof.

      (i)    All of the exhibits, addenda or riders attached to this Agreement shall be deemed incorporated herein by reference.

      (j)    Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC, unless otherwise defined herein.

**13.4    *Amendments in Writing*.** This Agreement cannot be changed or terminated orally. This Agreement is the entire agreement between the parties with respect to the matters contained herein. This Agreement supersedes all prior agreements, understandings and negotiations, if any, all of which are merged into this Agreement.

**13.5     Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of such provision.

**13.6     Survival of Representations and Warranties.** All representations and warranties made herein or in any other Financing Agreement and in any document, certificate or statement delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery of this Agreement and the Note.

**13.7     Absence of Prejudice to Lender.** Borrower acknowledges that the Bankruptcy Code and Federal Rules of Bankruptcy Procedure require it to seek Bankruptcy Court authorization for certain matters that may also be addressed in this Agreement. Borrower will not without the express consent of Requisite Lender (a) mention in any pleading or argument before the Bankruptcy Court in support of, or in any way relating to, a position that Bankruptcy Court authorization should be granted on the ground that such authorization is permitted by this Agreement (unless a Person opposing any such pleading or argument relies on this Agreement to assert or question the propriety of such) or (b) in any way attempt to support a position before the Bankruptcy Court based on the provisions of this Agreement. Lender shall be free to bring, oppose or support any matter before the Bankruptcy Court no matter how treated in this Agreement.

**13.8     Surcharge Waiver.** In accordance with and to the extent permitted by the Financing Order, Borrower hereby waives any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code during the period in which Borrower is authorized to use cash collateral or borrow funds.

**13.9     Counterparts.** This Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute but one and the same Agreement.

**13.10    Further Assurances.** Borrower, at the cost and expense of Borrower, shall execute and file all such further agreements, documents and instruments, and perform such other acts, as Lender may determine is necessary or advisable with respect to the Liens granted to the Lender on behalf of Lender and the enforcement of the Obligations in connection with this Agreement, the other Financing Agreements and the Financing Order and with respect to the priority of such Liens purported to be granted pursuant to this Agreement and the Financing Order.

**13.11    Release.** At such time as Borrower has repaid all of the Liabilities and this Agreement has terminated, Borrower shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its members, managers, officers, employees, agents, parents, subsidiaries and affiliates to such Borrower.

[the signature page is the immediately following page]

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date first above written.

LENDER:
AVANTI HEALTH SYSTEM, LLC

By:

Name:     James MacPherson

Its:      Managing Member


BORROWER:
Karykeion, Inc.

By:

Name:     Daniel J. Ansel

Its:      Chief Restructuring Officer

**EXHIBIT A**
**APPROVED BUDGET**

# EXHIBIT B

## REVOLVING SECURED PROMISSORY NOTE
### (Debtor In Possession)

$1,000,000
January __, 2010
Los Angeles, California

Karykeion, Inc., ("Borrower"), for value received, hereby promises to pay to the order of Avanti Health System, LLC, ("Lender"), in lawful money of the United States of America, pursuant to that certain Bridge Financing Agreement dated as of January __, 2010, by and between Borrower and Lender (the "Loan Agreement"), (i) the principal amount of $1,000,000 or, if lesser, (ii) the principal amount of all Advances outstanding as of the Maturity Date of the Obligations under the Loan Agreement.

This Note is the Note referred to in the Loan Agreement. All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein. In the event of any inconsistency or conflict between any term or provision of the Loan Agreement and any term or provision of this Note, the term or provision of the Loan Agreement shall control.

Borrower further promises to pay interest on each Advance hereunder in like funds on the principal amount hereof from time to time outstanding from the date hereof until paid in full, at a rate or rates per annum and payable on the dates determined pursuant to the Loan Agreement.

Payment on this Note shall be applied in the manner set forth in the Loan Agreement. The Loan Agreement contains provisions for acceleration of the Maturity Date of all outstanding Advances hereunder and all Obligations thereunder, upon the occurrence of certain stated events and also provides for optional and mandatory prepayments of principal hereof prior to any stated Maturity Date upon the terms and conditions therein specified.

All Advances made by Lender to Borrower pursuant to the Loan Agreement shall be recorded by Lender on the books and records of Lender. The failure of Lender to record any Advance or any prepayment or payment made on account of the principal balance hereof shall not limit or otherwise affect the obligation of Borrower under this Note and under the Loan Agreement to pay the principal, interest and other amounts due and payable under the Advances.

Any principal or interest payments on this Note not paid when due, whether at stated maturity, by acceleration or otherwise, shall bear interest at the Default Rate.

Upon the occurrence of a default hereunder or an Event of Default under the Loan Agreement, all unpaid principal, accrued interest and other amounts owing hereunder shall, at the option of Lender, be immediately collectible by or on behalf of Lender pursuant to the Loan Agreement and applicable law.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, and shall pay all costs of collection when incurred, including reasonable attorneys' fees, costs and expenses. The right to plead any and all statutes of limitations as a defense to any demand hereunder is hereby waived to the full extent permitted by law.

The amount of this Note is secured by the Collateral, the Liens and the super-priority claim of Lender identified and described as security therefor in the Loan Agreement.

This Note shall be governed by, and construed and enforced in accordance with, the laws of the State of California, excluding conflict of laws principles that would cause the application of the laws of any other jurisdiction.

The provisions of this Note shall inure to the benefit of and be binding upon any successor to Borrower and shall extend to any holder hereof.

BORROWER:
Karykeion, Inc.

By:

Name:      Daniel J. Ansel

Its:         Chief Restructuring Officer