**Weiss & Spees, LLP**
Michael H. Weiss (State Bar No. 107481)
Sherry D. Spees (State Bar No. 128392)
Laura J. Meltzer (State Bar No. 151889)
1925 Century Park East, Suite 650
Los Angeles, California 90067
Telephone: (424) 245-3100
Facsimile: (424) 245-3199
mw@weissandspees.com

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>KARYKEION, Inc., a California corporation,<br>DBA COMMUNITY AND MISSION<br>HOSPITAL OF HUNTINGTON PARK, DBA<br>PHYSICIANS SUPER CENTERS, INC.,<br><br><br>Debtor. | **Bk. No.** 01:08-17254-MT<br><br>Chapter 11<br><br>**DISCLOSURE STATEMENT DESCRIBING DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF FEBRUARY 19, 2010**<br><br>**Disclosure Statement Hearing**<br><br>Date: February 8, 2010<br>Time: 11:00 a.m.<br>Ctrm: 302<br>     21041 Burbank Blvd.<br>     Woodland Hills, CA 91367<br><br>**Plan Confirmation Hearing**<br><br>Date: March 18, 2010<br>Time: 11:00 a.m.<br>Ctrm: 302<br>     21041 Burbank Blvd.<br>     Woodland Hills, CA 91367 |

Printed on Recycled Paper

s:\karykeion\plan and disclosure statement\2nd amended plan & disci statement\2nd amended ds dated 2.19.10.clean.v2.docx

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................... 2

    A.   Purpose of This Document .................................................................... 3

    B.   Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ........... 4

        1.   Time and Place of the Confirmation Hearing ................................ 4

        2.   Deadline to Vote For or Against the Plan .................................... 5

        3.   Deadline for Objecting to the Confirmation of the Plan ................ 5

        4.   Identity of Persons to Contact for More Information Regarding the Plan ........ 6

    C.   Disclaimer .......................................................................................... 6

II.  BACKGROUND ..................................................................................................... 7

    A.   Description and History of the Debtor's Business ................................ 7

    B.   Principals/Affiliates of Debtor's Business .......................................... 7

    C.   Management of the Debtor before and after Bankruptcy ...................... 8

        1.   Management before Bankruptcy .................................................. 8

        2.   Management during Bankruptcy .................................................. 8

        3.   Liquidating Creditor Trust .......................................................... 9

    D.   Events Leading to Chapter 11 Filing ................................................... 10

    E.   Significant Events During the Bankruptcy .......................................... 11

        1.   Bankruptcy Proceedings ............................................................. 11

            a.   Significant Events. ............................................................. 11

            b.   The Estate's Professionals. ................................................. 17

            c.   Significant adversary proceedings currently pending ........... 17

            d.   Other Legal Proceedings. ................................................... 21

    F.   Actual and Projected Avoidance Recovery .......................................... 21

    G.   Procedures Implemented to Resolve Financial Problems ...................... 22

        1.   Management .............................................................................. 22

        2.   Response to California 2009 State Budget Crisis .......................... 23

        3.   AB 1383. ................................................................................... 23

        4.   DSH Payments .......................................................................... 25

        5.   Distressed Hospital Fund Payments ............................................ 25

        6.   Sale of Community Hospital. ...................................................... 26

Printed on Recycled Paper

H.    Rejection of Collective Bargaining Agreements and Other Labor Issues relating to the Sale to Avanti. ........................................................................................................ 34

I.    Current and Historical Financial Conditions ................................................ 36

III.    SUMMARY OF THE PLAN OF REORGANIZATION .................................. 36

A.    What Creditors and Interest Holders Can Expect to Receive Under the Proposed Plan..... 37

B.    Unclassified Claims................................................................................... 37

    1.    Administrative Expenses ................................................................. 37

    2.    Priority Tax Claims ......................................................................... 40

C.    Classified Claims and Interests ............................................................... 41

    1.    Classes of Secured Claims ............................................................. 41

    2.    Classes of Priority Unsecured Claims ........................................... 45

    3.    Class of General Unsecured Claims ............................................... 47

    4.    Classes of Interest Holders ............................................................ 48

D.    Means of Effectuating the Plan ............................................................... 48

    1.    Funding for the Plan....................................................................... 48

    2.    Creditor Trust and Disbursing Agent ............................................ 49

    3.    Reserve for Attorneys Fees and Disputed Claims. ........................ 49

    4.    Avanti Reserve. .............................................................................. 49

E.    Risk Factors ............................................................................................. 50

F.    Other Provisions of the Plan .................................................................... 50

    1.    Executory Contracts and Unexpired Leases.................................. 50

        a.    Assumptions .......................................................................... 50

        b.    Rejections .............................................................................. 51

    2.    Retention of Jurisdiction ................................................................ 51

G.    Tax Consequences of Plan ....................................................................... 51

    1.    Tax Liability of Debtor. .................................................................. 52

    2.    Taxation of the Creditor Trust. ...................................................... 53

IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES .......................... 54

A.    Who May Vote or Object .......................................................................... 54

    1.    Who May Object to Confirmation of the Plan ............................... 54

    2.    Who May Vote to Accept or Reject the Plan ................................. 54

        a.    What Is an "Allowed" Claim?................................................ 54

Printed on Recycled Paper

|  |  | b. | Definition of an "Impaired" Claim or Interest | 55 |
|---|---|---|---|---|
|  | 3. |  | Who May Not Vote | 55 |
|  | 4. |  | Who can Vote in More Than One Class | 56 |
|  | 5. |  | Votes Necessary for a Class to Accept the Plan | 56 |
|  | 6. |  | Treatment of Non-accepting Classes | 56 |
|  | 7. |  | Request for Confirmation Despite Non-acceptance by Impaired Class(es) | 57 |
| B. | Liquidation Analysis |  |  | 57 |
| C. | Feasibility |  |  | 62 |

$46,876 ................................................................................................................. 63

The second feasibility issue is whether Debtor will have enough cash over the life of the Plan to make the required Plan payments. This issue is not relevant because this is a plan of liquidation. ........................................................................................................................................ 63

YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS. ......................................................................................................................... 63

| V. | EFFECT OF CONFIRMATION OF PLAN |  | 63 |
|---|---|---|---|
|  | A. | Discharge | 63 |
|  | B. | Revesting of Property in the Debtor | 64 |
|  | C. | Modification of Plan | 64 |
|  | D. | Post-Confirmation Status Reports | 64 |
|  | E. | Quarterly Fees | 64 |
|  | F. | Post-Confirmation Conversion/Dismissal | 64 |
|  | G. | Final Decree | 65 |

Printed on Recycled Paper

## I.    INTRODUCTION

Karykeion, Inc., a California corporation, is the debtor in the above captioned Chapter 11 bankruptcy case. On September 22, 2008, Karykeion, Inc. ("Debtor") commenced this bankruptcy case by filing its voluntary Chapter 11 petition under the United States Bankruptcy Code ( the "Code"), 11 U.S.C. §§ 101 *et seq.*

All references to either "Section" refer to Sections of the Code unless otherwise noted. All references to "Estate" refer to the bankruptcy estate of Debtor created by section 541(a). All references to "Rule" refer to Federal Bankruptcy Rules of Procedure. All references to the "Court" refer to the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division.

Section 1129(a)(11) allows Debtor to propose a plan of liquidation, i.e., a plan to liquidate by selling assets of the Estate. Enclosed with this document is Debtor's Second Amended Chapter 11 Plan of Liquidation, dated as of February 19, 2010 (the "Plan").

Debtor is the party proposing the Plan sent to you in the same envelope as this document. Debtor is sometimes referred to as "Proponent". THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN.

Debtor proposes to sell substantially all of the Estate's operating assets to Avanti Health Systems, LLC or its designee ("Avanti") for $5,250,000, subject to certain adjustments, plus Avanti's assumption of up to $300,000 in liabilities ("Sale"). The Estate's remaining assets -- primarily its rights to litigation recoveries, cash on hand at the time of the sale to Avanti and approximately, $15,400,000 to which it is entitled pursuant to the Medi-Cal Hospital Provider Rate Stabilization Act (California Welfare & Institutions Code §§ 14167.1-14167.17) ("AB 1383") -- will be placed into a trust known as the "Trust for the Benefit of the Creditors of Karykeion, Inc." (the "Creditor Trust").[1] The Creditor Trust will then distribute its assets to

---

[1]    Debtor will not transfer any real property associated with the Mission Hospital campus located at 3111 E. Florence Ave or the Medical Office Building located at 3100 E. Florence Avenue in Huntington Park to the Creditor Trust, as these properties are subject to a settlement with CIG as set forth below in Part II.E.c.1.i].

lnted on Recycled Paper

creditors according to the terms of the Plan and the Code. See discussion in Part III. G.2, below, in connection with the tax consequences of the Plan for information on the Creditor Trust.

As described in more detail below, Debtor believes that the Plan is the best alternative for Debtor's creditors. Absent the Plan, and the sale to Avanti in particular, Debtor would need to cease operations. A cessation of operations would mean that Debtor would lose its rights to receive all or a substantial part of the AB 1383 Funds, described in Part II.G.3. In that event there would be a highly diminished distribution to certain priority creditors and no distributions to general unsecured creditors; whereas, Debtor projects that as much as $4,400,000 will be distributed to general unsecured creditors under the Plan before any litigation recoveries. *See* Part IV.B., below.

**Debtor urges all creditors to vote to accept the Plan.**

The "Effective Date" of the proposed Plan is five (5) business days following the first receipt by Debtor of monies to which it is entitled under AB 1383. These monies are referred to herein as the "AB 1383 Funds".

The "Confirmation Date" is the date on which the Court enters an order confirming the Plan.

A.      PURPOSE OF THIS DOCUMENT

This Disclosure Statement explains the Plan, contains information relating to the Plan and describes the process the Court will follow to determine whether to confirm the Plan.

**THIS DISCLOSURE STATEMENT EXPLAINS THE FOLLOWING:**

**(1)      WHO CAN VOTE OR OBJECT;**

**(2)      WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

**(3)      THE HISTORY OF DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

Printed on Recycled Paper

**(4)  THE THINGS THE COURT WILL CONSIDER IN DECIDING WHETHER TO CONFIRM THE PLAN;**

**(5)  THE EFFECT OF CONFIRMATION; AND**

**(6)  THE FEASIBILITY OF THE PLAN.**

\*  <u>This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.</u>

Please read the Plan as well as the Disclosure Statement.  Any inconsistency between the Plan and the Disclosure Statement will be resolved in favor of the Plan.   However, if the Plan is silent on an issue any terms expressed in this Disclosure Statement will be incorporated into the Plan by the order confirming the Plan (the "Confirmation Order").

Section 1125(a) requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Court has approved this Disclosure Statement as having enough information to enable parties to make an informed judgment about the Plan.  As such, any party can now solicit votes <u>for or against</u> the Plan.

PLEASE NOTE: By approving the Disclosure Statement, the Court has neither endorsed nor approved the Plan.  Further, the Court cannot recommend that parties vote for or against the Plan.

**B.  DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THE TERMS OF THE PLAN BIND NO ONE.  HOWEVER, IF THE COURT CONFIRMS THE PLAN, THE PLAN WILL THEN BIND DEBTOR AND ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.  Time and Place of the Confirmation Hearing**

The Court will conduct a hearing to determine whether to confirm the Plan on March 18, 2010 at 11:00 A.M. Pacific Standard Time, in Courtroom 302, United State Bankruptcy Court,

Printed on Recycled Paper

1 21041 Burbank Blvd., Woodland Hills, CA 91367. The Court has reserved additional time of

2 March 19, 2010 at 9:00 a.m., to continue the confirmation hearing if necessary.

3       **2.     Deadline to Vote For or Against the Plan**

4       If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot

5 and return it in the enclosed envelope to the following address:

6       Weiss and Spees, LLP
      Attn: Robin Goodwin
7       1925 Century Park East, Suite 650
      Los Angeles, CA 90067.
8

9    •    **DO NOT SEND YOUR BALLOT TO THE COURT OR DEBTOR.**

10    •    **YOUR BALLOT MUST BE RECEIVED BY THE CLOSE OF BUSINESS**

11       **(5:00 P.M. PACIFIC STANDARD TIME) ON <u>MARCH 12, 2010</u>, OR IT**

12       **WILL NOT BE COUNTED.**

13    •    **ONLY VOTES ACTUALLY CAST WILL BE COUNTED.**

14 **<u>DEBTOR ENCOURAGES ALL PERSONS HAVING THE RIGHT TO VOTE TO DO SO.</u>**

15       **3.     Deadline for Objecting to the Confirmation of the Plan**

16       Objections to the confirmation of the Plan must be filed with the Court and served upon

17 the following persons on or before 5:00 p.m. prevailing Pacific Time on March 10, 2010:

18       **<u>Counsel for Debtor:</u>**
      Michael H. Weiss, Esq.
19       Weiss & Spees, LLP
      1925 Century Park East, Suite 650
20       Los Angeles, CA 90067
      Facsimile (424) 245-3199
21       mw@weissandspees.com

22       **<u>Counsel for the Official Committee of Creditors Holding Unsecured</u>**
      **<u>Claims (the "OCC"):</u>**
23       Jeff Garfinkle, Esq.
      Buchalter Nemer, P.C.
24       18400 Von Karman Avenue, Suite 800
      Irvine, CA 92612-0514
25       Facsimile: (949) 224-6403
26       jgarfinkle@buchalter.com

27       **<u>Office of the United States Trustee ("OUST"):</u>**
      Kate Bunker, Esq.
28       Office of the United States Trustee

21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367-6550
Facsimile: (818) 716-1576
kate.bunker@usdoj.gov

**Counsel for Avanti:**
Samuel R. Maizel
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Facsimile: (310) 201-0760
smaizel@pszjlaw.com

**4.      Identity of Persons to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact

the following person **IN WRITING:**

Laura J. Meltzer, Esq.
Weiss & Spees, LLP
1925 Century Park East, Suite 650
Los Angeles, CA 90067
Facsimile: (424) 245-3199
e-mail: lm@weissandspees.com

Due to the large number of creditors, all requests for information should be either in writing or

by e-mail.  **Telephonic requests will not be returned.**

Employees of Debtor having questions about the Plan may contact:

Ms. Sandra Puig
Assistant Administrator
Community and Mission Hospital of Huntington Park
2623 East Slauson Avenue
Huntington Park, CA 90255
Tel.  (909) 240-0143
e-mail: spuig@cmhhp.com

**ONLY DEBTOR'S EMPLOYEES, AND NO ONE ELSE, SHOULD CONTACT MS.**

**PUIG ABOUT THE PLAN.  EMPLOYEES SHOULD NOT CONTACT MS. MELTZER.**

**C.      DISCLAIMER**

The financial data relied upon in formulating the Plan is based on information compiled

by Debtor from records maintained by it in the ordinary course of business or from information

received by Debtor from third parties.  Every effort has been made to be as accurate as possible.

Printed on Recycled Paper

Unless otherwise noted, financial data contained herein has not been subjected to an independent audit or review.

Financial projections contained in the Plan and this Disclosure Statement represent Debtor's best estimates of future events based on certain assumptions, some or all of which may not be realized. None of the financial analyses contained in this Disclosure Statement are considered to be a "forecast" or "projection" as technically defined by the American Institute of Certified Public Accountants. Any use of the words "forecast," "project," or "projection" within this Disclosure Statement relate to the broad expectations of future events or market conditions and quantifications of the potential results of operations under those conditions.

The Disclosure Statement is provided by Debtor. Debtor represents that everything stated in the Disclosure Statement is true to the best knowledge of Debtor's management and advisors. The Court has not yet determined whether the Plan can be confirmed and makes no recommendation as to whether creditors should support or oppose the Plan.

## II.     BACKGROUND

### A.     DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS

Debtor has operated two community hospitals in Huntington Park, California, one at 3111 East Florence Avenue ("Mission Hospital") and another at 2623 East Slauson Avenue ("Community Hospital") ( sometimes, collectively referred to as the "Hospitals") since January 1, 2006. At that time, Debtor acquired the Hospitals from CHHP, Inc., a subsidiary of Tenet Health Corporation. Several months prior to the bankruptcy, Debtor suspended patient service operations at the Mission Hospital. Debtor continues to operate Community Hospital and maintains Mission Hospital in good standing under its license.

### B.     PRINCIPALS/AFFILIATES OF DEBTOR'S BUSINESS

1.     Mitchell Rubin ("MR") is the sole director of Debtor, President of Debtor and sole trustee of the Rubin and Laurie Rubin 2007 Irrevocable Trust (the "Rubin Trust").

2.     The Rubin Trust is the sole shareholder of Debtor.

Printed on Recycled Paper

3. Edward Rubin, MD ("ERMD"), the father of MR, is along with his wife, a beneficiary of the Rubin Trust ERMD was president of Debtor until September 15, 2008. MR, ERMD and the Rubin Trust are sometimes collectively referred to as "Rubin".

## C. MANAGEMENT OF THE DEBTOR BEFORE AND AFTER BANKRUPTCY

### 1. Management before Bankruptcy

a. Edward Rubin: President, Secretary, Treasurer and Sole Director.

b. Mitchell Rubin: Vice President

c. Dennis Coleman: Chief Administrative Officer

d. Juliet Miranda: Chief Operating Officer and Chief Nursing Officer

### 2. Management during Bankruptcy

a. From September 22, 2008 to May 10, 2009, David Kaye ("Kaye") acted as chief restructuring officer and chief financial officer. MR acted as President. Dennis Coleman, ("Coleman") acted as Chief Executive Officer. Juliet Miranda acted as Chief Nursing Officer, and Chief Operating Officer.

b. On May 18, 2009, Daniel Ansel ("Ansel"), by and through his company D&A Management, replaced Kaye and became Debtor's Chief Executive Officer, Chief Financial Officer and Chief Reorganization Officer ("CRO"). *See* Order Approving Debtor's Motion for Order Authorizing Retention of D & A Management, Inc. and Daniel J. Ansel as Debtor's Interim Restructuring Manager [Docket No. 493] (Ansel Employment Order").

c. MR continued to act as President, Secretary and Sole Director. Coleman then became Chief Administrative Officer.

d. On June 26, 2009, Coleman ceased his duties as Chief Administrative Officer.

e. On December 31, 2009, MR terminated Ansel. After an emergency hearing, the Court reinstated Ansel. *See* Order Re: Emergency Motion for Appointment of Chapter 11 Trustee [Docket No. 705].

Printed on Recycled Paper

f.      On January 7, 2010, the Court modified the Ansel Employment order to clarify and expand Ansel's powers as CRO. *See* Supplemental Order Re: Emergency Motion For Appointment of Chapter 11 Trustee And Clarification of Order Authorizing Retention Of D. Ansel As Interim Restructuring Manager [Docket No. 716].

### 3.    Liquidating Creditor Trust

On the Effective Date, the Creditor Trust -- a liquidating trust for the benefit of the creditors of the estate will be established as a grantor trust and is intended to qualify as a liquidating trust under Revenue Procedure 94-45.  The trustee of the Creditor Trust will be Tom Paccioretti of Broadway Advisors, LLC (the "Liquidating Trustee")  who will act as the Estate's representative under Section 1123(b)(3)(B).  As such, the Creditor Trust will succeed and inure to all of Debtor and the Estate's rights, privileges and immunities, including the tolling of any applicable statutes of limitation under Section 108.  The Liquidating Trustee is experienced in handling the affairs of trusts such as Creditor Trust.  The Liquidating Trustee's qualifications and experience are set forth in Exhibit "1".  A copy of the Creditor Trust Agreement is attached as Exhibit "2".

The Liquidating Trustee will make all disbursements under the Plan or the Creditor Trust, except certain disbursements to secured and administrative creditors on the Confirmation Date. The Liquidating Trustee will supervise any litigation on behalf of the Creditor Trust, including (i) any litigation to recover preferences or other avoidable transfers and (ii) any other claims. The Creditor Trust and the Liquidating Trustee may retain counsel or other professionals as required.  Unless such professionals have already been approved as representatives of the Estate or the OCC, the Creditor Trust and the Liquidating Trustee must seek court approval of all such professionals.   The Liquidating Trust will have the authority to compromise any litigation or claim without further order of the Court, provided, the Liquidating Trustee obtains the consent of the post-confirmation OCC. Absent such consent, the Liquidating Trustee may seek approval of any compromise under Rule 9019.

Except as expressly released or otherwise provided in the Plan or the Creditor Trust Agreement  the Liquidating Trustee will retain and be authorized to enforce any claims, rights,

Printed on Recycled Paper

and causes of action that Debtor or the Estate may hold or have against any entity, all of which are preserved under the Plan, including rights of disallowance, offset, re-characterization or equitable subordination with respect to claims and interests, and derivative causes of action that may be brought on behalf of Debtor or the Estate.

The Creditor Trust is authorized under the Plan to pursue the claims, causes of action and rights vested (and re-vested) in it in accordance with its best interests. Recoveries on such claims, causes of action and rights will be recovered and retained by each of them, as applicable, free and clear of all liens, claims and interests.

The Estate may have other potential avoidance actions, including actions to set aside or recover transfers arising under Sections 544 through 549 and applicable state law, which may apply to transfers preceding the Petition Date by four or more years. The Estate may also have other claims against MR, ERMD and certain of their affiliates for, among other causes of action, breaches of fiduciary duties, aiding and abetting fraudulent transfers, defalcation and other business torts which they may have committed against Debtor. All such claims shall be preserved by the Creditor Trust. Without limiting the foregoing, the Creditor Trust preserves all possible claims even if such claims have not been specifically identified.

**D.     EVENTS LEADING TO CHAPTER 11 FILING**

The following briefly summarizes the circumstances that led to the filing of this Chapter 11 case:

a.     When Debtor acquired the Mission Hospital and Community Hospital from CHHP in January of 2006, the Mission Hospital historically operated at a deficit.

b.     In 2007, Debtor stopped providing urgent care at the Mission Hospital and in early March of 2008, Debtor closed the pediatric and obstetrical departments as well, terminated the employees and suspended operations at the Mission Hospital. Debtor did however maintain the related license as active.

c.     The provisions of the W.A.R.N. Act [29 U.S. §§ 2101 *et seq.*], required Debtor to pay terminated employees 60 days of compensation after termination. Together with other associated labor and miscellaneous costs arising out of the suspension of services at

Printed on Recycled Paper

Mission Hospital, Debtor allegedly incurred W.A.R.N. and related liabilities of $2,000,000 to $3,000,000.

d.    In the spring and summer of 2008, the California legislature failed to agree on an annual budget for 88 days. As a result, all regular Medi-Cal and Disproportionate Share Hospital ("DSH") payments to Debtor stopped. This represented 60 to 70 percent of Debtor's gross revenue. DSH payments compensate hospitals who serve a greater portion of Medi-Care and Medi-Cal patients.

e.    The combination of the extraordinary expenses imposed by suspending operations at Mission Hospital and the loss of revenue from the state budget crisis forced Debtor into bankruptcy.

**E.    SIGNIFICANT EVENTS DURING THE BANKRUPTCY**

**1.    Bankruptcy Proceedings**

a.    Significant Events.

The following is a chronological list of significant events which have occurred during this case:

- September 22, 2008:   Debtor files its voluntary Chapter 11 Petition.
- September 24, 2008:   The Court issues order authorizing interim use of cash collateral through October 24, 2008.
- October 6, 2008:      The Office of the United States Trustee appoints the following persons to be the members of the Official Creditors Committee ("OCC"): Pharmacy Healthcare Solutions, Inc.; Advanced Medical Analysis, LLC; The Fulcrum Group, Inc.; Mission Property Management; and X-PRT Medical Imaging, Inc. The Fulcrum Group Resigned from the OCC on October 20, 2008.
- October 24, 2008:      The Court approves second stipulation and interim order authorizing Debtor's continued use of cash collateral through January 16, 2009 and providing for adequate protection.

Printed on Recycled Paper

- November 6, 2008:   The Court directed the OUST to appoint Constance Doyle to act as patient care ombudsman ("PCO") under Section 333(a)(1).
- November 7, 2008:   The Court approves stipulation by and between Debtor and Fulcrum Group, Inc. ("Fulcrum") regarding post-petition services, assumption of executory contract and creation of trust agreement with respect to certain fees.
- November 15, 2008:   The Court sets the last day to file claims for non-governmental creditors to be January 15, 2009.
- November 17, 2008:   Debtor and the OCC file adversary complaint (AP Case No. 1:08-ap-01598) for avoidance and recovery of fraudulent transfer against Pasha Properties Investments, LLC, Commercial Investment Exchange, L.P., Desert Field, LLC, Desire Investment, LLC, Lior Investment, LLC, Mission Property Management, Personnel Leasing, Inc. (collectively "CIG") seeking to recover payments totaling approximately $2,500,000 and to avoid a sale lease back transaction whereby Debtor sold Mission Hospital located at 3111 East Florence Ave, Huntington Park, California and a Medical Office Building ("MOB") located at 3100 East Florence Avenue, Huntington Park, California .
- November 21, 2008:   The Court approves a stipulated order by and between Cardinal Health 2000, Inc., Cardinal Health 414, LLC, and Cardinal Health Solutions, Inc. (collectively "Cardinal") and Debtor authorizing continued use of Cardinal Cash Collateral and providing for adequate protection.
- November 25, 2008:   Order approving stipulation between Debtor and Huntington Park Mission Medical Group ("HPMMG") which continues the capitation agreement between Debtor and HPMMG regarding Health Net Capitation payments and stayed litigation filed by HPMMG against Debtor prior to the bankruptcy.
- December 5, 2008:   Court approves stipulation between Debtor and State of California (the "State") resolving Debtor's contempt motion against the State and

the Employment Development Department ("EDD") arising out of EDD's failure to pay Medi-Cal disbursements to Debtor.

- December 19, 2008: CIG files Motion to Compel Payment of Administrative Rent under Sections 365(d)(3) and 503(b)(1) with regard to Mission Hospital.

- December 23, 2008: Court enters order granting Debtor's motion to reject unexpired lease of nonresidential real property at 3001 E Florence Ave, Huntington Park California pursuant to Code Section 365.

- January 7, 2009: The Court enters approving stipulations to assume physician services agreements re: Ahmad Hajj, M.D. Gary Ford, M.D. Youssef Lalezarian, M.D. Raymond W.P. Leung, M.D. Tao Nguyen, M.D. Cyrus Parsa, D.O., Robert Orlando, M.D. Ihsan Shamaan, M.D., Stuart Strausberg, D.O. and Ricardo Chambi, M.D. pursuant to Section 365.

- January 23, 2009: The Court entered order approving third interim budget for Debtor's continued use of cash collateral through April 16, 2009.

- January 20, 2009: The Court enters an order [under seal] approving agreement with California Medical Assistance Commission regarding funds provided under California Health & Welfare Code § 14166.23.

- January 29, 2009: The Court enters order extending exclusivity provided in Section 1121(b) period for filing its plan and disclosure statement and soliciting acceptances to that plan to May 20, 2009 and July 19, 2009, respectively.

- January 29, 2009: The Court enters order granting motion to extend time to assume or reject leases of non-residential real property at: 2623 E. Slauson Ave., Huntington Park, California; and 5800, 5804, 5806, 5808 and 5810 Pacific Blvd., Huntington Park, California, to April 20, 2009.

- February 18, 2009: The Court enters order extending time to assume or reject leases of non-residential real property at: 3046 and 3111 East Florence Ave.; 7130 Mission Place, Huntington Park, California; and 3100 East Florence Ave, Huntington Park, California, to April 20, 2009.

Printed on Recycled Paper

- March 2, 2009: The Court entered a stipulated order granting alternate or amended order approving lessors' motion to compel payment of administrative rent under 11 Sections 365(D)(3) and 503(B)(1), or, in the alternative, to compel Debtor to reject lease.

- April 24, 2009: The Court entered an order granting first interim applications for payment of fees and reimbursement of expenses of professionals, as follows: Fainsbert, Mase & Snyder ("FMS") – $481,960.48; Crowe – $51,260.17; Buchalter – $61,265.55; Kevin Keenan ("Keenan") – $24,640.00; and PCO – $31,368.00

- April 24, 2009: The Court grants Debtor's motion to assume lease of non-residential real property re 2623 E Slauson Ave, Huntington Park, California 90255 ("Community Hospital") and 5800, 5804, 5806, 5808 and 5810 Pacific Blvd., Huntington Park, California.

- May 7, 2009: The Court enters order staying certain cases against Debtors' employees described in Part III.E.2 below, the PCO and others currently pending in the Los Angeles Superior Court.

- May 18, 2009: The Court permits Debtor to terminate David Kay and to retain D&A Management, Inc. ("D&A") as Chief Restructuring Officer. The order approving these matters was entered on June 19, 2009.

- May 19, 2009: The Court extends Debtor exclusive period to file a chapter 11 Plan and to solicit acceptances thereof to July 20, 2009 and September 20, 2009, respectively.

- June 24, 2009: Debtor filed an emergency motion pursuant to Section 1113(e) to make interim modifications to its collective bargaining agreements.

- July 14, 2009: The Court entered an order allowing Debtor to make interim modifications to its collective bargaining agreements.

Printed on Recycled Paper

- July 27, 2009: The Court continued stay of certain cases against Debtor's employees, the PCO and others currently pending in the Los Angeles Superior Court.

- July 27, 2009: The Court extends Debtor's exclusive period for filing Chapter 11 Plan to September 3, 2009, and to solicit acceptances until November 4, 2009.

- August 3, 2009: The Court indicated that it would allow Consumer Solutions, et al., to file a $1.5 million general unsecured claim after the bar date.

- August 5, 2009: The Court continued Debtor's authority to use cash collateral until October 3, 2009.

- September 2, 2009: Debtor files Chapter 11 Plan of Reorganization and Exhibits and [Proposed] Disclosure Statement Describing Debtor's Chapter 11 Plan of Reorganization.

- September 3, 2009: Court enters Order allowing creditor Consumer Solutions NPL-NF, LLC to file a general unsecured proof of claim after Bar Date.

- September 10, 2009: Stipulation By Creditor Business Loan Conduit No. 2, LLC, a Delaware corporation, as assignee of Community Reinvestment Fund, Inc., a Minnesota corporation, as assignee of CDC Direct Capital, a California corporation and Karykeion, Sterling Bank and Edward Rubin MD, Edward Rubin MD, Inc., and Momentum Medical Group, Inc. to compromise and settle disputes.

- September 29, 2009: Stipulation filed By Commercial Investment Exchange, L.P., Desire Investment, LLC, Pasha Properties Investments, LLC, Lior Investment, LLC, Desert Field, LLC, Mission Property Management and Debtor -[Stipulation Between Commercial Investment Exchange, L.P., Desire Investment, LLC, Pasha Properties Investments, LLC, Lior Investment, LLC, Desert Field, LLC, Mission Property Management, Personnel Leasing, Inc. and Debtor to Extend Deadline to File Proofs of Claim to November 30, 2009.

- October 8, 2009: Order (1) approving settlement between debtor-in-possession and Pasha Properties Investments LLC; Commercial Investment Exchange LP;

Desert Field LLC; Desire Investment LLC; Lior Investment LLC; and (II) authorizing debtor-in-possession to obtain credit under Bankruptcy Code Sec. 364.

- October 8, 2009: Sixth interim Order authorizing debtor's continued Use of Cash Collateral and providing for adequate protection.

- October 9, 2009: Amended Order entered (I) approving settlement between debtor-in-possession and Pasha Properties Investments LLC; Commercial Investment Exchange LP; Desert Field LLC; Desire Investment LLC; Lior Investment LLC; and Personnel Leasing Inc, and (II) authorizing debtor-in-possession to obtain credit under Bankruptcy Code Sec. 364.

- October 27, 2009: Statement - Election filed by Class D Creditor Cardinal Health of Application of 11 U.S.C. Section 1111(b)(2) in Connection With Debtor's Chapter 11 Plan of Reorganization Filed on September 2, 2009.

- November 18, 2009: Order approving motion pursuant to LBR 9013-1(o)(I) for approval of compromise and settlement between debtor in possession and secured creditor Business Loan Conduit No. 2.

- November 30, 2009: Order Approving Stipulation continuing hearing on Debtor's motion for seventh interim order authorizing use of cash collateral. Hearing set for December 10, 2009.

- December 4, 2009: Status report re Applicability of AB 1383 and Its Potential Effect on Debtor, filed by Debtor Karykeion, Inc.

- December 30, 2009: Seventh Interim Order Granting Motion to Use Cash Collateral entered.

- December 30, 2009: Order Overruling Debtor's Omnibus Motion for Order Disallowing Claims filed by X-PRT Medical Imaging Inc and Bridgeport Medical Management entered.

- December 31, 2009: Order re Emergency Motion for appointment of Chapter 11 Trustee and continuing hearing to January 5, 2010 entered.

Printed on Recycled Paper

- January 7, 2010: Order Supplemental re: Emergency Motion for Appointment of Chapter 11 Trustee and Clarification of Order Authorizing Retention of D. Ansel as Interim Restructuring Manager.
- January 13, 2010, the Court sets March 1, 2010 as the administrative claim bar date (which is not applicable to those with administrative claims not in the ordinary course of business and certain claims of employees who will have an extended deadline to file such claims which will be set by the Court at the Confirmation Hearing).
- February 8, 2010, Debtor obtains an order authorizing it to borrow up to $400,000 from Avanti under section 364(d).

PLEASE NOTE: Over 810 documents have been filed in Debtor's bankruptcy case. Any and all of these can be viewed at the Bankruptcy Court or on Public Access to Court Electronic Records (P.A.C.E.R.) at the Bankruptcy Court's website: www.cacb.gov.

      b.   <u>The Estate's Professionals.</u>

The Court has approved employment of the following professionals:

| Name | Type of Services | Date of Employment Order |
|---|---|---|
| Fainsbert Mase & Snyder, LLP ("FMS") (through June 15, 2009) | General bankruptcy counsel for Debtor | November 25, 2008 |
| Weiss & Spees, LLP ("Weiss") (from June 15, 2009) | General bankruptcy counsel for Debtor | September 11, 2009 |
| Crowe Horwath, LLP (formerly Grobstein Horwath & Company, L.L.P.) ("Crowe") | Accountants for Debtor | November 18, 2008 |
| Buchalter Nemer, P.C. ("Buchalter") | Counsel for OCC | November 25, 2008 |
| Epstein Turner & Song, PC ("ETS") | Special Labor Counsel for Debtor | September 11, 2009 |
| Constance Doyle ("PCO") | Patient Care Ombudsman | November 10, 2008 |
| D & A Management, Inc. | Restructuring Officer | June 9, 2009 |
| Law Offices of Kevin J. Keenan, ("Keenan") | Special Healthcare counsel for Debtor | January 15, 2009 |
| London & Pacific Financial Advisors ("L&P") | Investment Banking | February 10, 2010 |

      c.   <u>Significant adversary proceedings currently pending.</u>

The following is a list of significant adversary proceedings commenced in this bankruptcy case that remain pending at this time:

1           i.     *Karykeion, Inc., and The Official Committee Of Creditors Holding*

2   *Unsecured Claims v. Pasha Properties Investments, LLC, Commercial Investment Exchange,*

3   *L.P., Desert Field, LLC; Desire Investment, LLC; Lior Investment, LLC, individually and doing*

4   *business as Mission Property Management; and Personnel Leasing, Inc.* (Case No. 1:08-ap-

5   01598-MT). This case seeks avoidance of a sale-leaseback transaction involving Mission

6   Hospital as an actual or constructive fraudulent transfer and to re-characterize transaction as a

7   loan. The parties previously reached a court approved settlement "CIG Settlement"), although

8   subsequent events have mooted the terms of that settlement. To the extent that CIG objects to its

9   proposed treatment under this Plan, the Debtor and the OCC reserve their right to recommence

10  this lawsuit. Such lawsuit would be filed on behalf of the Estate and the Creditor Trust. Debtor

11  has entered into a further settlement of that claim whereby CIG agreed to accept an allowed

12  administrative claim of $1,250,000 and an allowed unsecured claim of $4,500,000. The

13  settlement needs to be approved by the Court and hearing on the motion to approve that

14  settlement under Rule 9019 is set for March 2, 2010. Objections have been filed and Sterling

15  Bank asserts that it has a lien upon the claims of CIG.

16          ii.    *Karykeion, Inc., a California corporation and Edward Rubin,*

17  *M.D., an individual vs. John Mulroe, an individual, et al.* No. 1:09-ap-01028-MT. Debtor

18  and ERMD filed a suit in Los Angeles County Superior Court against Mulroe, Affordable,

19  Cowell and Beck for Usury, Fraud and Declaratory Relief arising out of a series of alleged loan

20  transactions. Mulroe, Affordable, Cowell and Beck filed a Cross Complaint against Debtor,

21  ERMD, and MR for Breach of Contract, Fraud, Deceit, Money Had and Received, Unjust

22  Enrichment and Recovery of Personal Property. Mulroe, et al. subsequently moved in the

23  Bankruptcy Court to enforce the terms of a settlement agreement reached in the underlying

24  Superior Court litigation against the Rubins. Debtor removed case to this Court on December 4,

25  2008. The Court has approved a Stipulation to mediate this case, (as well as a related fraudulent

26  transfer adversary action brought by Debtor described in Part II.E.1(c) (iii), below) and ordered

27  the Mediation to be completed by September 30, 2009. The mediation has not yet been

28  concluded. Debtor has entered into a settlement of this case whereby the defendants release their

1  $1,000,000.00 liens on Debtors' assets in exchange for an allowed unsecured claim of $500,000.

2  The settlement needs to be approved by the Court and hearing on the motion to approve that

3  settlement under Rule 9019 is set for March 4, 2010.  No objections have been filed as of this

4  date.

5          iii.    *Karykeion, Inc., a California Corporation vs. John Mulroe and*

6  *Affordable Properties No.* 1:09-ap-01196-MT.  Adversary complaint to avoid fraudulent

7  transfers initiated by Debtor in bankruptcy court.  As noted in the preceding paragraph, the Court

8  has approved a Stipulation to mediate this case (and the related removed case).  This matter is

9  also subject to the same settlement agreement described in the preceding paragraph.

10          iv.    *Karykeion, Inc., a California corporation vs. Ihsan Shamaan,*

11  *M.D., an individual; Erlinda Colman, R.N., an individual; Mark Joseph Valencia, Esq., an*

12  *individual, and the Law Offices Of Mark Joseph Valencia*, APC.  No. 1:09-ap-01165-MT.

13  Adversary Complaint for Declaratory Judgment and Injunctive Relief against physician

14  independent contractor, nurse employee and their legal counsel to enjoin their prosecution of

15  Superior Court cases (the "Superior Court Cases") described in more detail in Part II.E.2 below,

16  against certain of Debtor's employees alleging employment related causes of action.  Debtor's

17  adversary complaint is premised on Sections 105(a) and 362 and is related to a motion filed by

18  Debtor to enforce the Section 362 automatic stay as to the Superior Court Cases.  The Superior

19  Court Cases have been ordered stayed until April 28, 2010.  Upon confirmation, this case will

20  proceed in the Superior Court.

21          v.    *Huntington Park Mission Medical Group, Inc. v. Karykeion, Inc., et*

22  *al.*  No Adversary Number was issued, as Case was removed by Debtor on October 17, 2008, in the

23  main bankruptcy case.  Los Angeles Superior Court action initiated against Debtor and others

24  arising out of dispute under a risk sharing agreement.  Case was ultimately resolved by stipulation

25  which the Court approved on November 25, 2008.

26          vi.    *Bridgeport Medical Management, Inc. v. Karykeion, Inc., a*

27  *California corporation and Does 1 through 10.*  Adv. Case No. 1:08-ap-01529-MT.  Suit brought in

28  bankruptcy court for monies allegedly owed by Debtor pursuant to a billing, management and

Printed on Recycled Paper

collection services agreement. Case dismissed by order entered on January 30, 2009 for failure to prosecute.

    vii. *X-PRT Medical Imaging, Inc. v. Karykeion, Inc., et al.* This action was initiated in the Los Angeles Superior Court against Debtor and others arising out of dispute under radiology related agreements. Plaintiff, its counsel and the Superior Court continued to take actions in the Superior Court despite automatic stay. Debtor filed an emergency motion for Contempt motion against plaintiff and its counsel for willful violation of the automatic stay and for an order enjoining plaintiff and its counsel from taking any steps to pursue the case in the Superior Court. On October 9, 2008, Debtor withdrew the contempt motion when Plaintiff agreed to abide by the automatic stay as to Debtor and all defendants, not only Debtor. Case dismissed by order entered on January 30, 2009 for failure to prosecute.

    viii. With respect to both Bridgeport Medical Management, Inc. and X-PRT Medical Imaging, Inc, on October 19, 2009 (the " October 19 Hearing') the Court held a hearing on Debtor's Omnibus Motion to Disallow the claims of X-PRT Medical Imaging, Inc. ("X-PRT") (Claim Nos. 9 and 301) and Bridgeport Medical Management, Inc. ("Bridgeport")(Claim No. 329)(collectively, the "Claims") on the basis that the Claims were Dismissed for Failure to Prosecute by Orders entered on January 30, 2009, which Orders are dispositions on the merits for purposes of *res judicata* (the 'Objections"). X-Prt filed a Proof of Claim in the amount of $260,319.24. Bridgeport filed a Proof of Claim in the amount of $1,500,000. At the October 19 Hearing the Court determined that the factual assertions set forth in the declarations submitted in support of X-PRT and Bridgeport's Oppositions to the Motion required that the witnesses making those assertions appear in Court to testify under oath and it continued the hearing to December 10, 2009. At the December 10 hearing, one of the principals of Bridgeport and X-PRT testified under oath. The Court entered an Order overruling the Objections, but specifically permitted Debtor to raise subsequent objections to the Claims on their merits. [Docket No. 703]. Debtor has filed a timely Notice of Appeal of the Order and the appeal is now pending before United States District Court for the Central District of California.

Printed on Recycled Paper

ix.    *John Esfandi v. Edward Rubin, et al.* Adversary Case No. 1:09-01043.  This action was initiated in the Los Angeles Superior Court against Debtor and others arising out of a claim for a commission for services performed by plaintiff in connection with efforts to obtain funding.  A motion to remand was denied and a pre-trial conference is scheduled for February 17, 2010.  Plaintiff's counsel has not prepared any court-ordered pre-trial documents and Debtor and co-defendants expect to seek an involuntary dismissal .

d.    Other Legal Proceedings.

In addition to the proceedings discussed above, Debtor is currently involved in the following non-bankruptcy legal proceedings:

i.    *Erlinda Colman v. David Kaye, et al.* (L.A. Sup. Ct, Case No. BC 412771), filed April 30, 2009.  Erlinda Colman, a registered nurse employed by Debtor filed the suit alleging that employees and management of Debtor engaged in harassment, retaliation, discrimination and other violations of California labor law.  The action has been stayed by the Court until April 28, 2010.  Upon confirmation, this case will proceed in the Superior Court.

ii.    *Ihsan Shaaman v. Daniel Suarez, et al.* (L.A. Sup. Ct., Case No. BC 412094), filed April 21, 2009.  Ihsan Shamaan, MD is a member of Debtor's medical staff filed this action alleging that employees and management of Debtor engaged in harassment, retaliation, discrimination and other violations of California labor law.  The Court has stayed this action until April 28, 2010.  Upon confirmation, this case will proceed in the Superior Court.

**F.    ACTUAL AND PROJECTED AVOIDANCE RECOVERY**

1.    Debtor has identified at least 56 transfers and payments totaling $1,167,939.54 which may be subject to avoidance as preferences.  A list of potential preference claims is attached as Exhibit "3".  Debtor is unable to estimate the amount of any recovery or the potential cost of any such recovery at this time.  These claims will be pursued by the Liquidating Trustee on behalf of the Creditor Trust.

2.    ERMD, the beneficiary of the Rubin Trust and the president of Debtor until September 15, 2008. ERMD made payments totaling $2,145,000 to Debtor during the period from January 1, 2006 to September 22, 2008.  During same period, Debtor made payments of

Printed on Recycled Paper

$5,663,312.77 to ERMD. A list of these payments to and from ERMD is set forth in Exhibit "4".
Debtor is treating the difference ($3,518,321.77) as a loan from Debtor to ERMD. In addition,
the Estate holds claims against ERMD, MR and certain of their affiliated entities for, among
other causes of action, breaches of fiduciary duties, aiding and abetting fraudulent transfers,
defalcation and other business torts which they may have committed against the Debtor.

With respect to the cash transfers, ERMD acknowledges the receipt of these monies but
disputes their characterization as a loan and believes that some of the monies received should be
treated as compensation for his services as president of Debtor, additional monies ERMD
advanced on behalf of Debtor or were advanced on ERMD's behalf to Debtor and for
guaranteeing some of Debtor's more substantial obligations. ERMD further claims that he or
persons on his behalf have advanced substantial sums for the benefit of the Hospitals. ERMD
claims that he cannot repay the sums that Debtor claims to be owed. ERMD delivered an
accounting of his assets but has not delivered an accounting of the monies withdrawn from
Debtor. Thus, at this time, Debtor does not know whether ERMD can answer to a judgment in
connection with these monies. Unless settled before the Confirmation Date, the Liquidating
Trustee will be authorized to pursue the Estate's claims against ERMD on behalf of the Creditor
Trust.

**G. PROCEDURES IMPLEMENTED TO RESOLVE FINANCIAL PROBLEMS**

To attempt to fix the problems that led to the bankruptcy filing, Debtor has implemented
the following procedures:

**1. Management**

Just prior to the filing of its bankruptcy petition, Debtor hired Kaye to act as the
CFO and Chief Restructuring Officer ("CRO"). D&A Management, Inc., through the services of
Daniel J. Ansel ("Ansel") replaced Kaye. Debtor hired Ansel to serve as Interim CEO/CFO and
CRO to manage the reorganization effort. Ansel implemented the following procedures to
further address the financial problems facing Debtor:

a. Strict cash controls and began reviewing every disbursement made by the
Debtor;

b.    Dramatic cost reduction program;

c.    Department level budgeting process to identify core staffing requirements for current patient volume and enhance operating accountability at the department level.

**2.    Response to California 2009 State Budget Crisis**

The California 2009 State budget crisis was even more significant than the 2008 crisis which resulted in an 88 day suspension of payments from the State, which was a prime cause of Debtor filing its Chapter 11 petition. In anticipation of possible delays in Medi-Cal and DSH payments as a result of the 2009 budget crisis, Debtor implemented a hiring freeze and negotiated a deferral of scheduled wage increases included in the collective bargaining agreements; implemented deferrals of physicians' fees, management wages, and adequate protection payments; and implemented a reduction in force and a reduction in scheduled shift hours in an effort to reduce cash disbursements and survive the summer cash crunch.

**3.    AB 1383.**

Governor Schwarzenegger signed the AB 1383 legislation in mid-October imposing an annual provider fee upon general acute care hospitals in the amount of approximately $2 billion. These funds will be utilized to obtain another $2.3 billion annually in matching Federal funds through December 2010. The fees paid by the hospitals, combined with matching Federal funds, will be used to make supplemental Medi-Cal payments to hospitals based upon such hospital's volume of Medi-Cal patients.

Debtor expects to receive $15,395,990.75 in AB 1383 funds. Federal approval is required before the legislation is implemented. Based upon the details of the federal approval of the AB 1383 program, the amount payable to Debtor could rise or fall by approximately 5%. Attached as Exhibit "5" is a letter from Assemblyman Jones, the sponsor of AB 1383, which explains the computation of the amount expected to be paid to Debtor. Attached as Exhibit "6" is a memorandum dated January 26, 2010 from the California Hospital Association ("CHA") updating the status of Federal approval of AB 1383.

Printed on Recycled Paper

To be eligible to receive the 1383 Funds, Community Hospital must remain open and operational when the AB 1383 Funds are paid. California Welfare & Institutions Code § 1467.8 which provides:

> The payments to a hospital under this article shall not be made for a subject federal fiscal year or any portion of a subject federal fiscal year during which the hospital is closed. A hospital shall be deemed to be closed on the first day of any period during which the hospital has no acute inpatients for at least 30 consecutive days. A hospital's payments under this article for a subject federal fiscal year during which a hospital is closed for a portion of the subject federal fiscal year shall be reduced by applying a fraction, expressed as a percentage, the numerator of which shall be the number of days after the implementation date during the subject federal fiscal year that the hospital is closed and the denominator of which is the number of days in the subject federal fiscal year after the implementation date.

Debtor believes this language is susceptible to two interpretations. The first is that upon closure, all right to the AB 1383 Funds cease. This interpretation is based upon discussions between a staff member of the Healthcare Subcommittee of the California Assembly ("Subcommittee") and counsel for the Debtor.

A second interpretation which more closely follows the language of the statute suggests if the Debtor ceases operations for more than 30 days, it loses the AB 1383 Funds that accrued during the portions of the 2010 and 2011 Federal Fiscal Years during which it is closed. "Federal Fiscal Year" as specified in 31 U.S.C. § 1102 commences on October 1st of the preceding calendar year and ends on September 30th of the calendar year. Thus the Federal Fiscal Year for 2010 commenced on October 1, 2009 and ends on September 30, 2010. If Debtor ceased operations on March 31, 2010, Debtor would forfeit that portion of the AB1383 Funds the nine month period between April 1 and December 31, 2010, a sum of $6,598,281.75. In that instance and under this second interpretation, Debtor would receive $8,797,709. The statute contains no alternatives to preserve the payments to which Debtor is otherwise entitled if it ceases operations.

Printed on Recycled Paper

Based on its counsel's review of the statute and conversations with staff members of the Subcommittee, Debtor is unaware of any restrictions on the use of AB 1383 Funds.

To receive AB 1383 Funds, Debtor must pay a "Quality Assurance Fee" of $4,902,271 per year. To receive the entire projected benefit, Debtor will have to pay a Quality Assurance Fee of $8,578,974.25. Debtor has been advised by the Sub-Committee that the State of California and the CHA are taking active steps to arrange for financing to help distressed hospitals like Debtor's to pay the Quality Assurance Fee. If those arrangements do not materialize, Debtor will seek financing from third parties. Based on preliminary investigations taken by Debtor, Debtor believes that such financing will be available at a cost which is unknown at this time.

**4.    DSH Payments**

Shortly after the Debtor's petition was filed, California passed its annual budget and resumed making payments under the Medi-Cal program. Furthermore, Debtor has received DSH payments from the State in the amount of $9,971,742 since September 22, 2008. These funds provided the Debtor with the working capital it needed to begin and continue the process of reorganizing. Debtor expects to receive an additional DSH payment of approximately $1,117,000 during the first week of March 2010.

**5.    Distressed Hospital Fund Payments**

Debtor received a substantial grant from the in Distressed Hospital Fund overseen by the California Medical Assistance Commission ("CMAC") in February and April of 2009. These funds have been used for payment of operating and marketing expenses incurred after their receipt. In addition, Debtor has used these funds to pay certain pre-bankruptcy obligations owed to the State, which are required and permitted by the terms of the CMAC grant. Generally, the terms of the grant do not permit the use of the funds to pay pre-bankruptcy expenses. The specific terms of the grant are confidential and have been sealed by order of this Court dated January 20, 2009. [Docket No. 306]. If Debtor receives any additional Distressed Hospital Fund Payments prior to the Sale, proceeds of such payments would be used for purposes specified in the grant or Debtor's ordinary operational expenses.

1    Debtor has been advised that the determination of whether it will receive any CMAC

2    funds will be made on February 18, 2010 and paid prior to the Confirmation Date.  As of the date

3    of this Disclosure Statement, Debtor has received no notice of whether it will receive any CMAC

4    funds.  If it does receive such funds, Debtor does not know what restrictions or mandates, if any,

5    CMAC may impose on the use of any such funds. Debtor will comply with any such restrictions

6    and mandates.

7    Debtor has reached a settlement with CIG for which Debtor will seek approval under

8    Bankruptcy Rule 9019.  Under the terms of the settlement, CIG will receive an administrative

9    claim of $1,250,000 and an unsecured claim in Class "J" of $4,500,000.  Debtor will waive its

10   fraudulent transfer claims against CIG and release any interest in the real property related to

11   Mission Hospital and the MOB.  CIG is the record owner of the Mission Hospital physical plant,

12   however, Debtor owns the furniture, fixtures, equipment and operating license associated with

13   Mission Hospital which it has maintained (collectively "Mission Assets").  If Avanti or any other

14   third party purchaser wishes to re-open and operate Mission Hospital, comes to an agreement

15   with CIG for the purchase or lease of physical plant and elects to purchase the license, Debtor

16   would be willing to sell it.  Avanti has a right of first refusal under the Memorandum of

17   Understanding between Debtor and Avanti dated January 12, 2009 ("MOU") for the Mission

18   Assets.  A copy of the MOU is attached hereto as Exhibit "7".[2]  If Avanti does not want the

19   license and no other buyer can be found for it, Debtor will abandon the license for Mission and

20   its contents.

21           **6.      Sale of Community Hospital.**

22           Debtor's initial reorganization plan filed on September 2, 2009 depended on (i)

23   timely receipt of certain grant funding expected from the California Medical Assistance

24   Commission ("CMAC") during December 2009, and (ii) commitment of approximately $3.0

25   million in exit financing to fund the initial plan payments.  Neither event happened.  Debtor

26   _____

27        [2]      The MOU contemplates the execution of a definitive agreement.  Debtor will submit
     an executed definitive agreement to the Court on or about March 3, 2010, which agreement will
28   distributed to creditors and parties in interest.

Printed on Recycled Paper

attempted to secure such accounts receivable financing during 2009 and early 2010 through the assistance of London & Pacific Capital Advisors ("L&P"). No lender was interested. Protracted negotiations were entered into with CIG during the month of December 2009 which continued into January of 2010, to assist in providing the necessary financing to fund the plan payments and give Debtor operating capital. CIG had expressed a willingness to provide interim financing and a limited guaranty to a third party lender providing financing who would be secured by Debtor's accounts receivable and the AB 1383 Funds. MR represented that he was in discussions with such a lender based in Florida, but declined to disclose the identity of the lender to Debtor's counsel or Mr. Ansel. Nevertheless, the principals of CIG provided financial information to John Rigdon, a broker who was assisting MR in obtaining the financing, to pass on to that lender in connection with its evaluation of CIG as a guarantor. Debtor and CIG continued their negotiations to arrive at a settlement agreement pursuant to which CIG would provide the interim financing and the guarantees throughout the month of December and into early January. No identification of the lender was ever made, no commitment ever materialized and by January 6, 2010, Mr. Ansel concluded that his efforts needed to concentrate on selling the Debtor's assets as an operating hospital to maximize the recovery to the creditors by keeping the hospital open to insure the maximum recovery of the AB 1383 Funds.

While Debtor pursued reorganization via DIP financing, Debtor remained open to all purchase offers, entered into a number of non-disclosure agreements with interested parties and continued negotiating with various interested parties for a sale of the hospital as a back-up plan in the event that the reorganization option failed in an effort to maximize the return to the creditors. Mr. Ansel had been in active discussions with Avanti regarding an asset sale since August 2009, and they were the sole party willing to move forward with a purchase of the assets of Debtor on a schedule that would allow Community Hospital to remain open. Only one other party, RB Counsel Capital ("RBC"), had expressed a serious interest in purchasing Debtor's assets and made an actual offer, but their offer was contingent on Debtor being able to deliver clean title to Mission Hospital and the MOB of which CIG was the title holder of record. RBC discontinued talks after Debtor advised RBC that it could not deliver clear title to Mission within

Printed on Recycled Paper

1  the time constraints under which Debtor was working.  Debtor also solicited a back-up offer
2  from Rose Ave Medical Partners, LLC ("Rose") which submitted a proposal, but at this time
3  Debtor is unaware of any formal offer by Rose.

4          Debtor currently operates at a loss and has insufficient funds to continue operations until
5  June of 2010 when approximately $11,000,000 in AB 1383 funds are expected to be paid.  To
6  insure Debtor's ability to remain operational until receipt of the AB 1383 Funds, Debtor entered
7  into the MOU with Avanti on January 12, 2009, pursuant to which Debtor would enter into an
8  agreement to sell substantially all of the assets of Community Hospital to Avanti (the "Sale") on
9  the first business day after the Confirmation Date ("Closing Date"), free and clear of all liens,
10  including claims for recoupment or set-off however denominated by any governmental agency
11  against Debtor's accounts receivable and any successor liability under Debtor's collective
12  bargaining agreements.

13          A summary of the terms of the MOU follows:

14      a.      Avanti shall purchase substantially all of the assets of the Debtor related to
15              the operations of Community Hospital, subject to specified exclusions.
16              Debtor has no knowledge of any relationship between Avanti on one hand
17              and any creditors or Debtor on the other hand.  Avanti will take over
18              management of the hospital operations shortly after the Confirmation
19              Date.  Once that happens, the Patient Care Ombudsman cease monitoring
20              patient care under Section 333.  Avanti has a privacy policy to insure
21              compliance with its obligations under HIPPA.

22      b.      Debtor will pay Avanti a management fee of $50,000 per month, payable
23              solely out of AB1383 Funds and all revenues and expenses of hospital
24              operations after the Confirmation Date will remain with Avanti, other than
25              the 1383 Funds.  The Liquidating Trustee will handle all issues arising in
26              connection with the distributions to creditors.  Mr. Ansel will make
27              himself available to consult with the Liquidating Trustee on claims
28              objections and creditor distributions as needed on an hourly basis.

Printed on Recycled Paper

c.     Aanti has agreed to lend Debtor up to One Million Dollars ($1,000,000) ("Bridge Financing") to enable Debtor to continue operations at Community Hospital pending confirmation of the Plan. As a condition to the Bridge Financing, Avanti must receive the protections provided by Section 364(d). On February 18, 2010, the Court announced that it would enter a final order approving such financing up to $400,000. The Bridge Financing will accrue interest at a rate of ten percent (10%) per annum, payable monthly and have a maturity date of 120 days after the entry of the order approving the Bridge Financing. The Bridge Financing shall be treated as an advance against the aggregate purchase price which Avanti is paying to Debtor in connection with the Sale.

d.     Upon the Closing Date, Avanti shall lease Community Hospital back to Debtor and operate it under an Interim Lease and Management Agreement ("IMA")[3] with Debtor until certain contingencies have been met, including the payment of any and all funds payable to Debtor pursuant to AB 1383, for a period not to exceed fifteen (15) months (the "Interim Management Period").

e.     The aggregate purchase consideration for the purchase of the assets shall be a maximum of $5,550,000 consisting of the following ("Purchase Price Consideration"):

    i.     Cash in an amount of $5,250,000.00 reduced by any: (x) unpaid principal and accrued interest due under the Bridge Financing provided by Purchaser to Seller prior to the Determination Date; (y) cure and other related payments, including indemnification obligations, made by Avanti in connection with contracts which are assigned and assumed; and (z) the amount by which Seller's

---

[3]     The IMA is an exhibit to the definitive agreement described above.

Printed on Recycled Paper

| | |
|---|---|
| 1 | eligible receivables are determined to be less than Four Million, |
| 2 | Five Hundred Thousand Dollars ($4,500,000.00). For these |
| 3 | purposes, "eligible receivables" is deemed to be the value of |
| 4 | Debtor's accounts receivables which Siemens deems as eligible to |
| 5 | be collateral for lending a portion of the Purchase Price |
| 6 | Consideration to Avanti. |
| 7 | ii. Avanti shall assume the following liabilities ("Assumed Employee |
| 8 | Liabilities") in an aggregate amount not to exceed Three Hundred |
| 9 | Thousand Dollars ($300,000.00) ("Employee Liability Cap") as |
| 10 | part of the Purchase Price Consideration: (x) unpaid priority wages |
| 11 | owed to current employees of Debtor who are offered and accept |
| 12 | employment with Avanti, in its absolute discretion; (y) |
| 13 | accumulated paid time off ("PTO") hours to current employees |
| 14 | who are offered and accept employment with Avanti in its absolute |
| 15 | discretion; and (z) unfunded 401(k) account obligations owed by |
| 16 | Debtor to current employees who are offered and accept |
| 17 | employment with Avanti in its absolute discretion. The decision as |
| 18 | to the dollar allocation of the Employee Liability Cap among the |
| 19 | Employee Assumed Liabilities shall be Avanti's, provided |
| 20 | however that it shall be allocated first to PTO obligations. |
| 21 | iii. Debtor has been audited through 2007 on the recoupment issues |
| 22 | and the balance of the FY 2007 recoupment is included in the Plan. |
| 23 | Although the number has not been finalized, the current projected |
| 24 | assessment is for $180,000 for FY 2008, which Debtor believes |
| 25 | may be further reduced. The cost report which gives rise to |
| 26 | recoupment claims for FY 2009 will not be completed until July |
| 27 | 2010. Typically, an audit will not be completed until after 2011 by |
| 28 | which time Avanti should be operating Community Hospital under |

its own license and should no longer be subject to any recoupment claims. The cost report and audit for 2010 operates under a similar schedule. Debtor has no way of knowing what the recoupment amount if any, will be for the 2009 and 2010 years.

iv. Debtor intends to sell the assets to Avanti free and clear of any liens or recoupment rights and Debtor and Avanti are currently in the process of contacting appropriate authorities to seek a "close-out" of all open years so that it can reserve an appropriate amount. In addition, Debtor will apply to the Court to estimate the Medicare and Medi-Cal claims for the open years pursuant to Section 502(c) and expects to complete this process by the Effective Date.

f. The following shall be excluded from the assets purchased in connection with the Sale: cash on hand as of the Closing Date; organizational documents; the names and web addresses associated with Debtor other than as necessary for Avanti to operate Community Hospital; all AB 1383 Funds payable to Seller, if any, whenever paid and to whomever paid; any collective bargaining agreements between Debtor and any labor union, including without limitation, collective bargaining agreements ("CBAs") between Debtor and the Service Employees International Union (the "SEIU") and between Seller and the California Nurses Association (the "CNA") and any obligations arising under the CBAs; any rights to recover transfers under Sections 544-551; litigation rights against any third parties; any affirmative defenses, counterclaims and rights of offset to any claims which may be asserted by any person or entity against Debtor; provided that such rights shall be shared between Debtor and Avanti according to their interests; any contracts or leases not assigned as part of the Sale; the license to operate at

Printed on Recycled Paper