FILED & ENTERED

APR 01 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY williams   DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re:

Karykeion, Inc.,

Debtor(s).

Case No: 1:08-bk-17254-MT

Chapter: 11

**AMENDED MEMORANDUM OF DECISION**

**RE: DEBTOR'S MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE SEIU AND CNA**

Date: Mach 11, 2010
Time: 1:00pm
Location: Courtroom 302

## I Introduction

The debtor, in this motion, requests that the court approve its rejection of Article 20 to two collective bargaining agreements ("CBA"). This motion stems from the unfortunate intersection of both the current recession and the state of healthcare in one of our poorest communities. There are no winners, only an attempt at damage control and an effort by all concerned to salvage some limited value from a deeply distressed situation.  Despite numerous setbacks, all parties have remained committed to keeping this hospital as a going concern for many reasons – continued jobs, healthcare needs of the community, and greater ability to pay creditors.

## II Findings of Fact[1]

Understanding the sequence of events is important to determining both the context of seemingly contradictory statements and the relevance of certain decisions made by the debtor and the unions, thus I explain in some detail the chronology of relevant events. The rejection of a CBA is a rejection of one of the most binding of contracts in our legal system and not a matter to be treated lightly,[2] so the situation leading up to such a result must be as clear as possible. These findings of fact are based on the statements and evidence provided at the many hearings in the bankruptcy case, the declarations and exhibits filed in connection with the motion, and the live testimony of three witnesses at the hearing on March 11, 2009.

### A. CHRONOLOGY LEADING UP TO THE SALE

Karykeion ("the debtor") filed bankruptcy on September 22, 2008. The debtor, at the time of filing, was managed by its President Mitchell Rubin and its Chief Restructuring Officer, David Kaye. The debtor, at the time of filing, operated Community Hospital of Huntington Park, operated a medical office building next to the hospital, and owned the license to operate the closed Mission Hospital. (The debtor's First Status Report, Docket #108) The debtor filed because of chronic financial difficulties and delays in expected supplemental funding. (*Id.*) The debtor hoped that Chapter 11 would allow it to reorganize. This proposed reorganization depended on the debtor reopening Mission Hospital, which would provide the efficiencies of a larger facility. Reopening Mission Hospital required the State of California to supply the debtor with additional funds. (October 16 Status Conference Hearing, 11:39-11:45). For reasons detailed in subsequent portions of this memorandum, reorganization proved beyond this debtor.

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party. F.R.B.P. 7052.

[2] *See, e.g., In Re Century Brass Products*, 795 F.2d 265, 271 (2d Cir. 1986)(CBA is cornerstone of labor law and is accorded higher status than normal contract).

At the time it filed, the debtor was a party to CBAs with the Service Employees International Union ("SEIU") and California Nurses Association ("CNA"). Article 20 of both CBAs ("successorship provision") requires the debtor to: (1) inform a new employer about the agreements, (2) require the new owner to retain substantially all of the bargaining unit employees, (3) require the new owner to recognize the union as the collective bargaining representative, and (4) require the new owner to assume the collective bargaining agreements.

From November 17, 2008, until March 12, 2010, the debtor endeavored to unwind a very complicated series of transactions affecting title to Mission Hospital.  From the start of the case, the debtor believed clear title to Mission was necessary to effectively reorganize or to sell the hospital, but the resolution of this issue was elusive.[3]

In December, 2008, CIG, the party involved in the sale-leaseback of Mission Hospital sought to compel payment of administrative rent on that building. This was followed by months of litigation in the related adversary proceeding related to the transfer of Mission Hospital.  This dispute distracted from the reorganization effort on other fronts, made it difficult to consider any sale, and consumed a significant amount of estate time and money.

In May 2009, Daniel Ansel replaced David Kaye as the CFO and CRO of the debtor. Mitchell Rubin remained the debtor's president. Ansel implemented further cash controls and engaged in cost cutting.  Over this time period, the California state budget crisis became increasingly severe, resulting in potential delays in Medi-Cal and Disproportionate Share Hospital ("DSH") payments.

In June of 2009, both CBAs required the debtor to increase the salaries it paid union members. Facing yet another cash flow crisis due to gaps in expected state funding, the debtor filed an

---

[3] A detailed analysis of this transaction can be found in the Creditors' Committee complaint in adversary case # 1:08-ap-1598.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

emergency motion, under 11 U.S.C. §1113(e), to stop these increases. The court denied the motion, but subsequently the parties reached an agreement to defer payment of the increased wages; the debtor projects paying these wages as an administrative expense.

In July of 2009, the debtor proposed a plan that would assume the CBAs and continue operations. The debtor continued to pursue this plan for some months, but the court was never asked to approve the disclosure statement, and the debtor proved incapable of pursuing this particular plan of reorganization. While the debtor publicly pursued a plan of reorganization, it also sought potential buyers and discussed selling substantially all of its assets through a liquidating plan. In July, the Official Committee of Unsecured Creditors ("Creditors Committee") made the court and parties aware that it believed a plan of liquidation was the debtor's best option for paying its unsecured creditors.

In August, Avanti approached the debtor and proposed purchasing solely Community Hospital and required the debtor to reject the CBAs.  At the time, the debtor did not seriously pursue this proposal because it still hoped to reorganize, so a majority of its efforts were focused on the plan of reorganization.  Towards the end of September or early October, Ansel received the vague structure of an offer from Avanti but he did not really study it at that time because he was so involved in the reorganization effort. (Testimony of Daniel Ansel, Hearing of March 11, 2010).  During this time, the debtor's cash situation remained dire. In September and October, the court held a number of hearings on the debtor's motions to approve settlements or approve continued use of cash collateral. The financials presented at these hearings consistently indicated that the debtor barely had cash to meet its ongoing expenses and maintain the emergency reserve necessary to close the hospital.

In October, Ansel and Mitchell Rubin drafted a term sheet of what they would require in an offer because there were certain issues Rubin insisted on including in any sale. Specifically, Rubin wanted any buyer to assume the debtor's tax obligations. Ansel did not agree with these conditions but the debtor sent these terms to both RB Counsel Capital ("RBC") and Avanti.  In

October of 2009, the debtor also sent Avanti an offer that required Avanti to assume the CBAs. Avanti rejected this proposal. While Rubin never affirmatively dissuaded Ansel from soliciting offers, Ansel, because of his disagreements with Rubin over what should be included, refrained from soliciting offers at this time.

Sometime in November, an entity referred to as Prospect expressed an interest in making an offer but that discussion never resulted in an offer. The debtor also compiled an Excel spreadsheet about this time summarizing claims to be paid and how much had to be received by what dates to keep operating. Copies of the CBAs were also provided to Prospect. Prospect submitted no offer and ceased returning Ansel's calls.

In October and November, the debtor still hoped to be able to reorganize, but Ansel knew that he needed to respond to the sale prospects in case he had to prepare for the worst.  In October, the debtor learned that it might be entitled to funds under Assembly Bill 1383 ("1383 money").  Ansel thought he could make the reorganization work if the debtor could find financing or Distressed Hospital Funds to hold the debtor over until the 1383 money arrived. Sale discussions were largely put on hold while the debtor explored the scope and reliability of the 1383 money.  Following discussions with sponsors of the bill and the California Hospital Association, Ansel believed the funds were real and would arrive by June 2010.

In December 2009, RBC discussed a bid and contemplated assuming the CBAs and operating both Community and Mission Hospital. The debtor informed RBC that it could not acquire clean title to Mission Hospital at that time; RBC subsequently withdrew its offer.

At the same time, due to the California state budget crisis, the state of California did not provide expected funding.  The cash the hospital had received from the California Medical Assistance Commission ("CMAC") had been reduced because Mission Hospital remained closed and expected supplemental funds had not arrived. Without the expected funds, the debtor, during the period between fall 2009 and early 2010, maintained an average monthly

operating loss of approximately $500,000. This continued operating loss made it impossible for the debtor to continue operations until June of 2010, when the debtor expected to receive the first portion of the 1383 money.  On or about December 23, 2009, Ansel, after reviewing the cash flow statements, decided to sell the hospital. At the end of December, Ansel called Joel Friedman, his contact at Avanti, informing Mr. Friedman that the debtor would pursue a sale. Friedman did not think Avanti could still do the deal it had proposed earlier, and that he would get back to the debtor.

Ansel recalled telling SEIU that the debtor had to consider selling instead of reorganizing towards the end of December.  He does not recall the exact date as things were moving so quickly at that point.  He recalls also telling management and employees at the very end of December that he was looking into a sale.

At this point, disagreements between Rubin and Ansel increased. On December 30, 2009, Rubin fired Ansel, triggering an emergency hearing on December 30th. Rubin fired Ansel because Ansel refused to approve the malpractice insurance carrier that Rubin chose. At the December 30 hearing, the court ordered Ansel to sign a contract with the insurance carrier that Ansel believed best. The court continued the hearing until January 5, 2010. At the January 5 hearing, the debtor's general bankruptcy counsel indicated that he would resign unless the court clarified who ran the debtor. Counsel indicated that Ansel and Rubin gave counsel conflicting directions. The court entered an order expanding Ansel's powers. Counsel remained as general bankruptcy counsel for the debtor in possession. Ansel, once freed from Rubin's control, felt free to negotiate with potential buyers.

### B. UNION NEGOTIATIONS

In part, because of the debtor's dual management, the debtor continued to negotiate with the SEIU for a new collective bargaining agreements, even as the prospect of reorganization faded. Between October and December of 2009, the debtor sat down with representatives of

the SEIU. As detailed below, the parties disagree about what information was provided to the

unions at these bargaining sessions. It is undisputed, however, that the debtor's bankruptcy

counsel, on December 11, 2009, provided union counsel with the names of lawyers

representing two potential buyers.[4]

The debtor and the union, however, disagree on whether the debtor told the union that it

intended to sell.

According to Ansel, the two or three members of the debtor's management team that

bargained with the SEIU knew that the hospital was running low on cash and that the hospital

needed bridge financing and would ultimately be sold. Ansel did not provide the negotiating

team any specifics about the possible sale terms at that time. He does not recall telling the

management team that Avanti would not assume the CBAs until later in January.

Ansel did not tell employees then that the hospital was being sold.  Jesus Berumen, a SEIU

member, shop steward, bargaining team member and cook in the Food Services Department

testified that he had attended employee forums in November and December and asked Ansel

if the hospital was being sold or was for sale.  Ansel responded that nothing was on the table,

that the hospital was not currently for sale, and that Ansel would tell them when there was a

sale.  Gail Scanland, a licensed vocational nurse, also testified about the December

negotiations. Scanland worked at Mission Hospital for thirty nine years and then at Community

Hospital for the last two years after Mission Hospital shut down. She is a Chief Steward and a

Bargaining Member of SEIU. She was present for the bargaining sessions for the new CBA in

December and asked if the hospital was up for sale.  Ansel said it was not.

Both employees are clearly dedicated employees who testified honestly after sitting through

over six hours of hearings on this motion.  The employees were credible and moving and

represented the many other workers who have worked for many years at this hospital who are

---

[4] The debtor did not provide Union counsel with the buyers' names because the debtor believed that non-disclosure agreements prevented it from revealing buyer information.

deeply concerned about losing their jobs.  Their belief that Ansel misrepresented the situation to them is understandable, but not accurate.  There was in fact no sale at the time these meetings occurred and Ansel had not started serious talks with Avanti until later when he realized the critical condition of the hospital after certain expected funds did not arrive.  Ansel did not misrepresent the general direction of the hospital, but he was still working on both reorganization and a sale.  As he stated, he was hoping for the best, but preparing for the worst.

On December 31, 2009, the debtor's CBA with SEIU expired by its own terms. The parties agreed to extend the CBA to January 15, 2010. The parties did not agree to a further extension and the CBA expired by its own terms. The debtor's CBA with CNA expires on June 30, 2010.

## C. AVANTI SALE

From January 7 to 12, 2010, the debtor and Avanti spent long hours negotiating and trading drafts of a potential memorandum of understanding ("MOU"). The debtor was still seeking to resolve the Mission Hospital fraudulent transfer litigation, so the debtor made it clear to Avanti that they would have to make an offer solely for Community Hospital.  At that point, no other potential suitor was interested either because Mission Hospital was not available or other unknown factors.

Neither SEIU nor CNA was present at the January 7 – 12 negotiations with Avanti.  Ansel was focused on preserving jobs during these negotiations and, while he could not move Avanti off their rejection of the CBAs, insisted that a provision be put in the MOU that Avanti would try to hire employees of the debtor. An early draft of the MOU indicates that Avanti would make offers to a substantial portion of the current workers but the current MOU indicates that Avanti would consider them on equal footing with all other applicants. While it is still unclear how many jobs the debtor saved, there is no doubt that it tried.

On January 12, 2010, the debtor signed an MOU to sell the hospital to Avanti. The MOU
required the debtor to reject parts of both collective bargaining agreements.  After signing the
MOU, the debtor emailed a copy of the MOU to the unions' attorneys.  This was the first the
unions learned of the terms of the negotiations between the debtor and Avanti.

After agreeing to the sale terms, the debtor requested that Avanti provide a DIP loan so that
the debtor could make it through until it confirmed a plan. After two lengthy hearings, the court
approved this lending on February 8, 2010.

### D. CBA REJECTION AND THE 1113 MOTION

On January 13, the SEIU sent a request for 43 items to the debtor for specific information and
documents relating to the debtor's negotiations with all potential buyers.  This list included an
extensive list of documents, emails, and correspondence relating to all possible buyers, all
negotiations with any of them, all requests made by the debtor in any of those negotiations, all
notes taken in any of the negotiations, any reports of any consultants as well as all financial
statements used in the negotiations.

 The debtor responded in a letter dated January 21, but no copy of that letter was provided to
the court.  There seems to be no dispute that the debtor did not turn over all the items
requested, but instead provided some information verbally in subsequent meetings.

On January 14, the debtor filed an emergency motion requesting further use of cash collateral,
and requesting the suspension of adequate protection payments previously ordered because
of the critical cash flow situation and the need to still finalize the interim debtor-in-possession
financing from Avanti.  On January 19, the motion was opposed until various changes and
concessions could be made to allow the debtor to continue operating.  Once again, the court
warned the parties that it would order Mr. Ansel to commence closing the hospital at any point
that sufficient cash reserves were not on hand to close down in an orderly fashion with no risk
to patients.  At that hearing and all other hearings where this issue arose, Ansel assured the

court that he was fully in agreement with that approach and was monitoring the situation to avoid any patient care issues.

On January 21, 2010, the debtor proposed to the unions that Article 20 be eliminated and members' severance be reduced to $150 a week per year served.  In response to the debtor's proposal, the unions asked for severance projections and other documents.  Ansel also informed the union the severance reduction was designed to increase unsecured creditor support for the plan.

On January 25, SEIU wrote a letter to the debtor's labor counsel requesting detailed breakdowns of the workers, wages and benefits of all workers at the debtor as well as details of exactly which workers will be hired by Avanti and under what terms.  They also requested Avanti's cost savings analysis, the data and assumptions used by Avanti, the funds expected by the debtor from the 1383 money and various other governmental grants.

On January 28, a representative of CNA sent Ansel an email agreeing to a meeting as soon as possible and explaining why it is to Avanti's advantage to retain the debtor's nurses and asking for more information about the debtor's severance proposal. The debtor could not respond to the detailed requests regarding severance because it does not yet know how the severance will be reduced by the employees Avanti hires and what the length of service is for such employees.  The unions also already have the debtor generated reports showing the dates of hire for each of their members. Ansel subsequently held three meetings with the unions.

On February 2, Ansel and the debtor's labor counsel met with representatives of the SEIU to bargain over the debtor's proposal.  SEIU once again requested the proposals the debtor exchanged with Avanti and other potential buyers.  The debtor has only produced a copy of the debtor's October 2009 proposal and the January 12, 2010 MOU.  Ansel met with SEIU representatives and answered questions for three hours.  He testified that he felt this was the

most efficient way of answering all questions, given the lack of staff and time to search out every document and email covered in the document request.

On February 2, Ansel also sent an email to a CNA representative explaining the basis for the debtor's severance proposal.  On February 2, Avanti's labor counsel responded to Ansel's earlier requests for information about Avanti's future hiring decisions, stating that it could not respond to the debtor's questions concerning future labor relations arrangements but that it would fairly consider applications from current employees.

On February 4, CNA's counsel sent an email to Ansel requesting that he more aggressively pursue having Avanti's attorney contact her. CNA also reiterated their concession that they would waive severance for bargaining unit employees offered comparable jobs by Avanti if Avanti would meet with the union to address its concerns.

On February 9, Ansel sent an email to CNA's counsel explaining why he thought the debtor's proposal to provide severance to employees would be of assistance in helping them to get paid more out of the bankruptcy estate.  He also explained what he felt would happen if Avanti walked away.

At the three meetings that were held, Ansel answered questions and informed the unions that he attempted to make Avanti assume the CBA's, but Avanti refused.  Ansel stated that his goal was to retain as many jobs as he could, but that he did not make it a requirement of the deal that Avanti recognize the unions or retain substantially all of the debtor's employees.  He explained that Avanti had refused and he could not dictate to Avanti who they hire. Ansel proposed that he try to convince Avanti to consider recognizing the unions in exchange for economic concessions and a promise not to unionize Avanti's other two hospitals.

SEIU made a counter proposal that eliminated the requirement that Avanti assume the CBA but required Avanti to hire employees and recognize the SEIU as the bargaining unit.  Ansel

met with Avanti and passed on SIEU's ideas. Avanti rejected SEIU's proposal.   CNA made a

counter offer in that it said it would assist the debtor to increase its receivable collections; CNA

did not offer to modify Article 20.  The debtor also rejected CNA's offer as Avanti would not

agree to it.  Ansel was focused on saving jobs and felt assured that Avanti was interested in

hiring some of the debtor's employees.


On February 11, CNA's counsel requested a meeting to negotiate further. On February 12,

2010, the debtor filed this motion. On February 17, CNA's counsel sent an email to the

debtor's labor counsel requesting that the debtor insure that Avanti retain the debtor's

employees and detailing the reasons why that is so important.  They also renewed their offer to

audit patient files to increase revenue. On February 19, a SEIU representative requested

another meeting regarding the 1113 proposal.


On February 22, the SEIU representative e-mailed the debtor and said they would be available

to meet all week.  On February 24, the debtor's labor counsel responded asking for any new

proposals in writing so that he could review it with his client.  The SEIU representative

responded the same day and stated that the SEIU was interpreting the response as a refusal

to bargain under section 1113 and that the hospital was refusing to meet in person.  The

debtor's counsel responded that he needed to know if the union had any further proposals or

information that they wanted the debtor to entertain and that, at a minimum, he wanted to

review such material before the debtor commits to further meetings. On February 25, the SEIU

representative responded that the union wanted to meet in person and that a demand for

further proposals first is in violation of the duty to meet.  The union stressed that they would be

happy to provide further proposals at the meeting but they wanted to do so in person.


On March 1st through 5th, Avanti held a job fair for people in the hospital industry in Downey,

California.  Avanti represented that it received over 1200 employment applications. CNA

represented that Avanti made direct offers to may job fair applicants but told current hospital

employees that it would take two weeks to make offers. CNA also represented that Avanti

provided different color applications to current Community Hospital employees.

The hearing on the debtor's 1113 motion was held on March 11, 2010.[5]  During the previous

week, four other emergency hearings were scheduled in this case in order to address

protective orders, the settlement of a number of lawsuits that had been removed from state

court and highly controversial motions to settle the fraudulent transfer allegations related to

Mission Hospital.  Dozens of pleadings were filed in just the ten days leading up to this motion

in an effort to resolve significant outstanding issues before the debtor ran out of operating

funds and had to be closed.

**III Conclusions of Law**

    A. Jurisdiction

The threshold issue to be decided is the jurisdiction of the court to decide the motion as it

relates to SEIU.  There is no jurisdictional question in connection with the CNA. It is undisputed

that the CBA between the SEIU and the debtor expired on January 15, 2010. It is further

undisputed that the debtor made its initial proposal to the union on January 21, 2010. On

February 12, 2010, the debtor filed its motion to reject the collective bargaining agreements.

SEIU argues that the court may not rely on 11 U.S.C. §1113 to modify an expired collective

bargaining agreement, and jurisdiction lies solely with the National Labor Relations Board

("NLRB").

Section 1113 of the Bankruptcy Code gives a bankruptcy court the authority to modify or reject

a collective bargaining agreement if the debtor follows certain steps prescribed by the statute.

Appellate courts and bankruptcy courts universally agree that §1113 gives a bankruptcy court

---

[5] Negotiations between the debtor and the unions continued after the hearing but the negotiations continued to be fruitless.  *See Supplemental + Post-Hearing Declaration of Manuel Boiges*, filed March 12, 2010.

the authority to modify an unexpired collective bargaining agreement. Courts, however, are split on whether a bankruptcy may modify or reject a collective bargaining agreement that has previously expired by its own terms. *In re Sullivan Motors Delivery, Inc.*, 56 B.R. 28 (Bankr.E.D.WI. 1985)(finding that a debtor could not modify an expired collective bargaining agreements; *AFL-CIO v. Ormet Corp.* (*In re Ormet Corp.*), 2005 U.S.Dist. Lexis 42573 (E.D.OH August 19, 2005)(finding that §1113 applied to expired collective bargaining agreements).

The Bankruptcy Appellate Panel for the Ninth Circuit has addressed this question on two occasions. In *In re Hoffman Brothers*, the BAP considered whether a union's purported request to negotiate constituted a termination under an "evergreen clause." 173, B.R. 177 (9th Cir. B.A.P. 1994). The court found that the request to terminate a contract did not constitute a rejection under the evergreen clause. *Id.* at 183-184.  The *Hoffman Brothers* court went further and found that §1113 gives a bankruptcy court authority, even if a CBA has expired, to modify or reject the CBA. *Id.* at 184. The *Hoffman Brothers* court included this reasoning only after extensively analyzing the Supreme Court's *Bildisco* opinion and Congress' purpose in enacting §1113. *Id.* at 181-184.

The issue arose again in *In re San Rafael Baking Co.*, 219 B.R. 860 (9th Cir. B.A.P. 1998). In this case, the court addressed §1113 in the context of a claims hearing. *Id.* at  862-863. The Bankruptcy Court in *San Rafael* was confronted with a union motion for the allowance of an administrative expense. *Id.*  The union and the debtor, at the beginning of the case, had a collective bargaining agreement. The CBA required the debtor to make payments into the union's healthcare fund. The debtor ceased making payments two months into the case. One month after the debtor stopped making payments, the CBA expired on its own terms. Approximately seven months after the CBA expired, the healthcare fund filed motion for allowance of an administrative claim, alleging that the debtor owed the fund the one payment owed under the CBA and the seven payments that the debtor would have paid if the CBA continued in effect. *Id.* at 862-863. The Bankruptcy Court, effectively interpreting the National

Labor Relations Act ("NLRA"), determined that the CBA continued in effect past its expiration

and the debtor was required to continue funding the healthcare fund on an ongoing basis. The

BAP overruled this interpretation. The BAP ruled that §1113 did not give a bankruptcy court

the authority to interpret labor laws. *Id*. at 865-867. Instead, the BAP found that the NLRB had

the exclusive authority to interpret the NLRA. *Id*. In *dicta,* the court found that §1113 did not

give a bankruptcy court authority to modify an expired collective bargaining agreement. *Id*. at

867.


In both of these cases, the BAP's analysis of the jurisdiction that §1113 gives to bankruptcy

courts confronted with expired collective bargaining agreements was non-binding *dicta. See*

*The Cetacean Community v. Bush* 386 F.3d 1169, 1173 (9th Cir. 2004)(defining *dictum* as a

statement included in judicial opinions that is not necessary to decide the case before the

appellate court and therefore not binding on lower courts). In *Hoffman Brothers*, the issue of

whether a §1113 allows a debtor to reject an expired CBA was not necessary for the court's

decision; the BAP found the CBA still in force. In *San Rafael Bakery*, the issue of whether

§1113 allowed a debtor to reject an expired CBA was not necessary for the court to find that

§1113 does not give a bankruptcy court authority to interpret the NLRA. Because the BAP's

statements on this issue are *dicta*, and this court is faced with the issue directly, this court must

look to §1113's language, the legislative history surrounding its enactment, and the BAP's

statements on the issue.


Section §1113's language and purpose indicate that it allows a debtor to terminate or modify

its ongoing obligations to its organized workforce, whether those arise as a result of a current

or expired CBA. Specifically, §1113(e) allows a debtor to modify a collective bargaining

agreement during "the period that it continues in effect" when it finds that such modification is

necessary for continuation of the debtor's business or to avoid irreparable harm to the estate.

The phrase "continues in effect" is a term of art regularly used in labor law and decisions

interpreting labor law. *See Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 200

(1991). The phrase refers to the time between the expiration of a CBA and the NLRB deciding

that there is an impasse and the two parties are no longer bound by continuing effects of the agreement. As detailed below, the intersection of the Bankruptcy Code and the NLRA was under heated discussion at the time this language was drafted, and this phrase was not randomly used.  It must also be read in conjunction with the last sentence of the statute which prohibits a debtor from unilaterally terminating or altering a CBA without complying with §1113. Such language is intended to give the debtors the authority to reject the continuing effects of expired collective bargaining agreements through compliance with §1113 instead of the NLRA.[6]

This interpretation also comports with judicial and congressional history that led Congress to enact the legislation that became §1113. Congress enacted §1113 in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984). In *Bildisco*, the Court found that 11 U.S.C. §365(a) allowed a debtor to reject a collective bargaining agreement. *Id.* at 521-522. The *Bildisco* court went on to find that bankruptcy code, prior to the debtor assuming a contract, prevented the NLRB of finding the debtor violated §§8(a)(5) & 8(d)[7] of the NLRA if the debtor failed to bargain to an impasse before unilaterally modifying the terms of employment. *Id.* at 532-534. The Court reasoned that, post-petition and prior to assumption, no enforceable contract existed. *Id.* Thus, the NLRB had no basis for bringing an unfair labor practice action. *Id.* While the *Bildisco* court applied this reasoning to an executory collective bargaining agreement, the reasoning seemed to extend to expired collective bargaining agreements that continue in effect as a result of the NLRA: i.e. the NLRB would not be able to bring an unfair work practices claim when a debtor failed to follow terms of an expired agreement.[8] The court justified this exception to the NLRA's bargaining strictures by referencing Chapter 11's purpose of reorganization and how requiring the debtors and labor

---

[6]  Further, §1113 does not include the term executory, suggesting that the court retains authority to reject or modify expired CBAs.
[7]  The court, in describing these two provisions of NLRA, does not presume to interpret the provisions. The court just uses them to set out the boundaries of the Supreme Court's decision and Congress' response.
[8]  The Court suggests that once an agreement expires that the debtor has a continuing obligation to bargain collectively for a new agreement. This obligation, as detailed by the Court, is different from the obligation to maintain the terms of the prior agreement.

unions to go through the formal bargaining process in the middle of a bankruptcy proceeding would doom many a reorganization with complex and time consuming proceedings overseen by another administrative body.

Congress quickly reacted to this decision by enacting §1113. *In re Certified Air Techs., Inc.*, 300 B.R. 355, 361 (Bankr.C.D.CA 2003). Section 1113 codifies parts of the Supreme Court's ruling and rejects other parts of the ruling. For instance, the enactment of §1113 formally gave the debtor the power to modify collective bargaining agreement. Section 1113, however, made it clear that filing for bankruptcy did not authorize a debtor to make unilateral modifications to a collective bargaining agreement but instead the debtor had to follow the procedures outlined in §1113(e). Because *Bildisco's* reasoning appears to give a debtor authority to reject or modify the residual obligations of a collective bargaining agreement, it would be an odd result to find that §1113, enacted specifically to codify and modify *Bildisco*, did not allow a debtor to modify its residual obligations if it followed §1113's procedures.

This interpretation is consistent with other powers that the Bankruptcy Code gives to a debtor in possession to restructure its affairs. Holding that §1113 does not allow a debtor reject the residual effects of an expired contract would greatly impede that overriding goal. If a debtor filed for bankruptcy one day after its labor contract expired, the debtor would be locked into these labor rates until the NLRB declared an impasse and found that the debtor and workers were no longer bound by the prior contract; the bankruptcy court could only wait for the NLRB to complete its process. Alternately, the NLRA's procedural hurdles might dissuade a debtor from modifying its labor agreements, leaving the debtor less competitive when it emerges from bankruptcy. A debtor with current labor agreements, however, could modify all of its labor agreements without going to the NLRB. This difference makes little sense when the statute specifically includes the phrase "continue in effect" and the purpose of bankruptcy is to allow a debtor to modify its ongoing obligations so that it does not have to liquidate.

Finally, this interpretation does not conflict with the statute vesting the NLRB with exclusive

jurisdiction to administer the NLRA. Section 1113, as interpreted by this court, does not give a

court the authority to interpret or administer the NLRA. A bankruptcy court cannot find that

parties bargained to an impasse or that the NLRA requires a debtor to continue to honor

specific portions of its contract. Section 1113, instead, creates a parallel track that allows a

debtor terminate the obligations it has to workers. Any actions that the debtor takes prior to

that termination are still under the jurisdiction of NLRB and the bankruptcy court has no

authority to rule on violations of the NLRA. The bankruptcy court may only determine whether

a debtor has or has not met the requirements of §1113 and is entitled to terminate or modify its

ongoing obligations to its workers. This determination does not require any determination of

obligations under the NLRA, and much of the SEIU's arguments have conflated those issues.


B.  Section 1113


The applicable parts of section 1113 are as follows:


(b) (1) Subsequent to filing a petition and prior to filing an application seeking

rejection of a collective bargaining agreement, the debtor in possession or

trustee (hereinafter in this section "trustee" shall include a debtor in possession),

shall--

(A) make a proposal to the authorized representative of the employees

covered by such agreement, based on the most complete and reliable

information available at the time of such proposal, which provides for those

necessary modifications in the employees benefits and protections that are

necessary to permit the reorganization of the debtor and assures that all

creditors, the debtor and all of the affected parties are treated fairly and

equitably; and

(B) provide, subject to subsection (d)(3), the representative of the

employees with such relevant information as is necessary to evaluate the

proposal.

   (2) During the period beginning on the date of the making of a proposal
provided for in paragraph (1) and ending on the date of the hearing provided for
in subsection (d)(1), the trustee shall meet, at reasonable times, with the
authorized representative to confer in good faith in attempting to reach mutually
satisfactory modifications of such agreement.


(c) The court shall approve an application for rejection of a collective bargaining
agreement only if the court finds that--

   (1) the trustee has, prior to the hearing, made a proposal that fulfills the
requirements of subsection (b)(1);

   (2) the authorized representative of the employees has refused to accept such
proposal without good cause; and

      (3) the balance of the equities clearly favors rejection of such agreement.


Section 1113 of the Bankruptcy Code sets procedural and substantive requirements that a
debtor must follow in order to reject a collective bargaining agreement. Congress enacted
§1113 to protect employees from the threat of a debtor unilaterally rejecting a collective
bargaining agreement. *In re Certified Air Techs*, 300 B.R. 355, 361 (Bankr.C.D.CA 2003). In
order to reject a CBA, the debtor must strictly comply with all of §1113's requirements. *Id.*


Bankruptcy cases generally approach this complicated statute by breaking the statute into a
nine part test, *see e.g., In re Family Snacks, Inc.*, 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001).
Although the Ninth Circuit has never specifically adopted this approach, the nine step analysis
used in these cases is an effective way to approach this multipart statute and tracks each of
the statute's requirements.


A debtor has the ultimate burden of proof by a preponderance of the evidence on all issues. *In
re Express Freight Lines, Inc.*, 119 B.R. 1006, 1011 (Bankr.E.D.WI 1990). The unions have the

burden of production on elements 5, 7, and 8 once the debtor makes a prima facie evidence that it complied with the requirements. *Id.*

### 1. Proposal Made under §1113(b)(1)(A)

The evidence is clear that the debtor made a proposal as required by §1113(b)(1)(A) on January 21, 2010, to modify the collective bargaining agreement.  The debtor's proposal requested the union "(i) eliminate Article 20 (and thereby relieve the Hospital of its impossible obligation of requiring Avanti to assume, and to hire all of the employees covered under the CBA); and (ii) provide for a reduced severance benefit under Article 4.D and Article 13.Q equal to $150 for each year of continuous service to each member upon receipt of the AB 1383 funds from the State of California.  The reduced severance benefit will be paid to only those employees who are not offered positions with Avanti." (Exhibit G to the motion).

### 2. Based on Complete and Reliable Information

The debtor's proposal must have been "based on the most complete and reliable information available at the time of such proposal."  §1113(b)(1)(A).  "[This] requirement goes to the comprehensiveness of the underlying factual support for a debtor's projections under § 1113(a) - its breadth, depth, and objective credibility. Clearly, the statute's idea is that a debtor-employer must make a proposal firmly grounded in the historical reality of operational economics, an unvarnished evaluation of its current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future, whether subject to the financial obligations of its collective bargaining agreement(s) or not. The requirement essentially bars a debtor in possession from making a proposal that is cursory or arbitrary, or one whose specific terms are result-driven in isolation rather than process-derived and based on actual experience."  *In re Mesaba Aviation, Inc.*, 341 B.R. 693, 709 (Bankr.D.MN. 2006) (citing *In re American Provision Co.*, 44 B.R. 907, 909-910 (Bankr.D.MN.1984).

This is a difficult standard for a debtor in possession to apply with precision in a severely distressed situation where the information on which the debtor relies could change at any time, and in fact has shifted regularly.  Here, the potential debtor-in-possession financing failed to come through numerous times, the State of California was experiencing one of the most severe budget shortfalls in decades, health care related government funding sources were either cut back or delayed, and potential buyers never materialized.  Even after the debtor signed the MOU with Avanti, a fourth potential buyer, Rose Avenue, appeared and teased everyone with claims of a better offer but has failed to retain experienced bankruptcy counsel or submit specific terms for a sale.

The debtor is simply required to gather the most complete information available at the time and to base its proposal on the information it considers reliable.  This requirement by definition excludes hopeful wishes, mere possibilities and speculation.  Just as section 1113 precludes a debtor from altering union contracts based on wishful thinking and speculation, so a debtor facing imminent closure cannot base its rejection of its only suitor on a speculative white knight with greater riches.

The debtor's liquidation and book market values along with its most recent financial statements were provided to all parties in early September 2009 as part of the plan of reorganization proposed at that time. The debtor updated these projections at the numerous cash collateral hearings this court held between September and the end of January. The debtor's disclosure statement provided a further update of these numbers. The reliability of the financial basis for the debtor's decision to sell has never been challenged by any party, although no one has been pleased with the terms of that sale.  Significantly, the debtor's exclusivity period has long expired, but no other party has proposed a plan despite the debtor's offer to send word processing copies of its plan for anyone to modify and the court's approval of a process where simply a supplement to the debtor's disclosure statement would suffice for an expedited plan confirmation.

The relevant time of the proposal at issue here was mid-January.  There may be other issues for earlier time periods that were discussed at the hearing, but they are simply background for the relevant inquiry under §1113.  Everything came to a head after January 12, 2010, because (a) there was no escaping the fact that reorganization was an impossibility, and (b) a buyer had finally committed (albeit still with numerous contingencies.)  At that time, the debtor certainly would have welcomed a higher and better offer than Avanti's and would have liked to convince Avanti to assume the CBAs, but there was no reliable information that this was possible.  Both of the other potential buyers had disappeared, one following the disclosure of the claims in the case and the second once it was clear that title to Mission Hospital could not be included.  At that time, Ansel hoped he could still save some jobs with Avanti but the fact that Avanti would not agree to the CBAs was a reliable fact, however unfortunate.  It is noteworthy that the debtor did not move to reject any part of the CBAs before this time in order to cut costs or attract other buyers.  It was not until there was no other choice but to go with Avanti and their terms that the debtor decided to file this motion.

Based on the above, I find the debtor's proposal was "based on the most complete and reliable information available at the time of such proposal" under §1113(b)(1)(A).

3. Modification Must Be Necessary

A preponderance of evidence indicates that rejecting the modifications is necessary to permit the debtor's reorganization.  The MOU signed with Avanti makes the sale contingent on the debtor's receipt of "an order of the Bankruptcy Court approving the rejection of all of its Collective Bargaining Agreements pursuant to Code §1113 prior to the Closing Date." (Paragraph 17(m), page 11, MOU) Counsel for the debtor has represented on multiple occasions that the debtor will withdraw the plan and Avanti will walk away from the deal if the court does not approve the rejection of the collective bargaining agreements. Ansel, in his prior testimony before this court, provided adequate evidence that the hospital cannot survive past

March 31st of this year. Further no other party has filed a competing plan of reorganization. These facts, taken together, indicate that the only reorganization option for the debtor is the sale of Community Hospital to Avanti and that sale is contingent on the court approving the debtor's rejections of these CBAs.

This situation differs markedly from that presented in *In re Bruno's Supermarket, LLC*, a case on which the unions rely. 2009 Bankr. Lexis 1366 (Bankr. N.D. Ala 2009).  In *Bruno's*, the evidence showed that the debtor was seeking to reject a similar CBA successorship clause because  it felt it could more effectively market itself without such a requirement.  There was no specific sale identified and all buyers were still just potential suitors.  While a number of prospective buyers had expressed concern about the successorship clause, there was testimony that certain potential buyers might still be willing to negotiate parts of the union contract.  The debtor here is not simply seeking to "enhance the market value" of its assets, as the court concluded in *Bruno's*.  The debtor tried to find a buyer who would assume the CBAs and tried to reorganize its existing structure without rejecting any CBAs.  It is now pursuing the only course of action left to it other than shutting down immediately and has already exhausted negotiations with the only prospective buyer still willing to proceed.  Whether the debtor could have avoided being painted into this corner can be debated, but it is now crowded into the corner along with the other interested parties in the case.

The unions argue that because the asset purchase agreement that has now been signed does not contain a clause rejecting the CBAs that it is clear that it is not necessary.  This does not change the position of Avanti expressed at the hearing on this motion that they simply cannot afford to purchase the hospital with the unions involved.  The risk of having Avanti walk away from this deal remains. As discussed at the regular status conferences concerning the debtor's cash flow, the hospital will begin closing down later this week if there is no confirmation of the plan proposing the sale to Avanti.

The unions further argue that the rejection is not necessary for the sale because Avanti will not be bound by the terms of the CBAs unless it expressly assumes the CBAs. The unions cite a number of labor law cases in support of their argument. The unions' interpretation of these opinions may be correct, but the court does not need to look at the effect denying the rejection of the CBAs. The debtor has presented adequate evidence that the deal with Avanti will collapse and the deal with Avanti is the only deal currently available to the debtor. It is not this court's position to evaluate the wisdom or accuracy of Avanti's position – only whether their purchase of the debtor's assets is necessary and whether they are likely to rescind their offer if their terms are not met.  This requirement has been met.

### 4. Treats Parties Fairly and Equitably

The fact that the workers who have put their heart and soul into saving this hospital for the past 18 months are not guaranteed jobs in a sale is undoubtedly an unfair result. That reality must, however, be tempered by an understanding of all the parties and interests in evaluating this prong of the analysis as well as the realities of this case.  As the debtor points out, a plan confirmation will ensure that the employees are paid the wage increase amounts they postponed by agreement last June. Their pay was not suspended at any time during the case and, subject to a few limited grievances, their benefits and jobs have been maintained over the course of the case.  If the debtor had not successfully negotiated for more time with creditors, the hospital would have closed in early 2009.

The professionals in this case have, in fact, succeeded in keeping this hospital open over a year and a half after filing bankruptcy, much longer than the court believed possible at the outset of the case.[9]  They have faced constant obstacles, some of which were unforeseen because of the state budget crisis and deepening national recession.  As detailed in the disclosure statement, there are approximately $2 million in unpaid professional fees.  These

---

[9] This is also much longer than the debtor indicated that it would be in bankruptcy.

professionals are carrying not only their salaries but the extensive expenses incurred in such cases.  At numerous points, the case threatened to need conversion to Chapter 7, potentially wiping out the likelihood of being paid much at all of what is owed in administrative fees. All have agreed at the many lengthy hearings that this case is not just about getting creditors paid, but about continuing to keep jobs in this recession and keeping necessary health care in a low-income community.  The stress of this case on these individuals has been apparent for many months at many lengthy contested hearings. Their extreme patience and sacrifice is not typical of many Chapter 11 cases. Normally, such considerations are irrelevant and go with the territory, but a discussion of the payment of wages requires a comment on this unusual predicament.

Other creditors are also either not getting paid or are receiving far less than the debt owed. Depending on the actual receipt of 1383 money, the level of administrative claims and the resolution of the remaining disputes, the unsecured creditors may be paid little to nothing.  All hope for a rosier result, but this is by no means assured.

Sadly, there is sufficient shared pain to find that this modification treats all parties fairly and equitably.

5. §1113(b)(1)(B) – Unions Must Have Relevant Information Necessary to Evaluate Proposal

The debtor is to "provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal."[10] The debtor bears the

---

[10] Section 1113(d)(3) provides that:

> The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

initial burden of producing evidence of the information that it has provided to the union. The burden then shifts to the union to rebut the debtor's explicit or implicit assertion that such evidence is sufficient to enable an evaluation of the proposal.   *See In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1011 (Bankr.E.D.WI 1990)

The breadth and scope of the information depends on the circumstances of the debtor and severity of the modifications.   *In re Mesaba Airlines*, 341 B.R. 693, 714 (Bankr.D.MN 2006).  In this case, the debtor has presented adequate evidence of its dire financial condition. The debtor presented this evidence in support of its disclosure statement, motions to modify cash collateral orders, and other proceedings before this court.

The SEIU requested the debtor turn over all of Avanti's proposals and disclose more about RBC. (Boiges Dec. Exhibit 1)  A critical question here is how much of the debtor's information should be turned over related to attempts to find a buyer, negotiations and earlier drafts of any MOU and information about what the proposed buyer will do once it acquires the hospital.

Originally, it appeared that the debtor agreed, prior to making a proposal to the union, that it would reject the CBAs which led the court to believe the debtor must provide the court and the union with detailed information about its negotiations with Avanti and RBC.  It became clear through the testimony of Daniel Ansel and a closer study of the exhibits that the debtor was in constant negotiation with Avanti and the CBA provision (along with others) was always subject to negotiation by the debtor with Avanti.

The debtor did not provide much information in its briefs about what it provided the unions about the details of negotiations that it had with Avanti between October of 2009 and January of 2010 or the details of RBC's offer, leading the court to originally conclude in its tentative ruling that inadequate information was provided. This impression changed dramatically when

Daniel Ansel testified at the hearing and the exhibits were studied more closely.  The unions diminish the information that had been provided in lengthy meetings with Mr. Ansel.

Although the debtor could have turned over more documentation if it had more time both to negotiate further NDAs with previous potential buyers and to sort emails and copy records, its disclosure was sufficient in light of when things were definite and how fast things were moving since December when Ansel determined the hospital's financial situation was more dire than previously thought.  Section 1113(b)(1)(b)'s requirement to provide relevant information to the unions has been satisfied.

The unions have pointed to the lack of information provided in November and December to the union representatives despite questions they asked about a sale. This conflict says more about the language used by employees in a distressed situation and that of a professional turnaround person than it does any intentional misrepresentation.  What Ansel told employees was consistent with representations made by the debtor's counsel in open court – they hoped for a buyer or they hoped to be able to reorganize, but neither plan was a reality yet.  Perhaps the debtor could have clarified the Chapter 11 process better to employees who have expertise in health care but not reorganization proceedings, but this was not the bad faith that the unions have argued.

### 6. 1113(b)(2) - The Debtor Must Meet At Reasonable Times

Determining what amounts to reasonable times depends on the circumstances of the situation. Ansel met three times and attempted to pursue the unions' concerns with Avanti before and after these meetings.  SEIU argues that it represented the workers and should have been afforded more reasonable time to negotiate with Avanti. Section 1113 does not require the debtor to engage in futile acts – Avanti would not meet with the unions and Ansel was clearly making no progress with getting Avanti to accept any of either his or the unions' ideas on how to get any part of the CBAs accepted by Avanti.  As numerous other emergency motions and

hearings were progressing and needed to be concluded to move this case towards confirmation, the decision of a CFO/CRO not to spend hours in fruitless negotiations was not unreasonable. Ansel's fiduciary duties extended to all creditors.  With the ship sinking fast and every creditor seeking to preserve some partial payment of its debt, there was a lot for a CFO/CRO to do.

Under these circumstances, the requirement for reasonable meeting has been met.

### 7. The Debtor Must Confer in Good Faith

Under 1113(b)(2), the debtor must "to confer in good faith in attempting to reach mutually satisfactory modifications" of the CBA. With respect to this element, the union has the burden of producing evidence that the debtor did not engage in good faith bargaining.  *See Mesaba Aviation* at 712-713; *In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1011 (Bankr.E.D.WI 1990).

As was clear from the tentative ruling posted before the hearing, I had concerns about whether the debtor had provided sufficient information to the unions and whether it had operated in good faith.  After a seven hour hearing, these concerns have been resolved.  Listening to Mr. Ansel testify along with a review of the 938 item docket detailing many of the events in this tortuous path, I can only conclude that the debtor endeavored to provide the most accurate information available at each relevant juncture and operated in good faith.  It is important not to confuse Avanti with the debtor in discussing the union's requests.

The Unions are correct that beginning negotiations when one party is already locked into a position does not constitute good faith. *See In re Lady H Coal*, 193 B.R. at 242 (finding good faith lacking when the debtors had already obligated themselves prior to initiating modification negotiations.)  This the debtor was, however, not locked in.  This situation differs from *Lady H Coal* both because the debtor passed the unions offers along to Avanti, tried to negotiate

further with Avanti on behalf of the unions, and the debtor only signed a MOU with Avanti before negotiating under 1113, not an asset purchase agreement. The MOU states on page 2, paragraph 5, that except for three sections inapplicable here, the MOU did not create "any binding legal obligations between the Parties, and each Party reserves the right to approve the definitive Agreement and to address the results of any diligence in connection with developing a definitive Agreement."  Significantly, the creditor's committee was still providing information to "Rose Avenue," as unlikely as that potential bid appeared to be.  No break up fee to Avanti was ever approved, nor was pre-approval sought by the debtor.

As evidence of the debtor's lack of good faith, the unions point to (1) Ansel's failure to tell them about specific sale offers and the debtor's plans to sell in November and December 2009 when negotiations were occurring with SEIU for a new CBA, and (2) the debtor's reassurance of employees that there was no definite sale at employee forums held around the same time. There are two problems with this.

Most importantly, the debtor's ability to sell in November and December 2009 was not definite – no willing buyer had committed, and negotiations were not yet at serious enough levels.  The need to sell as one of the likely options had been discussed in open court since September along with a number of other possible exit strategies.  Mitchell Rubin allegedly was still searching for DIP financing and the fact that it might be just around the corner was discussed at regular status conferences. The unions are portraying mere possibilities as definite events when this was an extremely fluid and unpredictable situation.

Secondly, what a debtor can tell employees is limited by both the practicalities of clear communication with hundreds of people as well as legally binding non-disclosure agreements. The debtor has a duty to provide information to parties as required by the law and its fiduciary duties, but it should not provide bits and pieces that could either be misleading out of context or disruptive of delicate negotiations with third parties.  As was evident from the testimony, rumor control and employee morale were critical problems.   With regular discussions in court

about the possible need to shut the hospital down, the employees were hanging on any bit of information they could get.  Ansel properly did not provide information that was not yet fairly definite.  He did not have a clear offer until the MOU was signed on January 12, 2010, so he could not tell the employees that he did have a sale.  For him to start discussing possible offers, initial discussions and the many other parts of the dance potential buyers and sellers engage in would have been potentially irresponsible and in violation of non-disclosure agreements.

It was clear at every junction after the disclosure statement hearing was continued in September that no one knew whether there would be a reorganization, sale or sudden closure followed by liquidation. The fact that the debtor was on life support was discussed regularly from September forward and caused great frustration among all creditors.  At one hearing, even the fully secured creditor threatened to cut off the endless parade of failed exit strategies by bringing a motion for a trustee.[11]

The unions argue that had they known the debtor was that close to a sale, they would have used their contacts to try to find a nonprofit buyer or government assistance in the sale.  There was ample opportunity to offer that assistance to the debtor, and any suggestion that more knowledge of potential bidders would have enabled them to find a better deal than Avanti's, is completely unsupported by any evidence.  To the contrary, no other bidder has appeared for the last two months despite everyone's knowledge that there were no funds for the debtor to operate the hospital past the end of this month.

The unions understandably object to Avanti's flat out refusal to negotiate any terms other than rejection of the CBAs.  The unions' position is that Avanti has violated applicable labor laws and they will be held liable at some point in NLRB proceedings.  *See, e.g.*, *NLRB v. Massey Energy*, 354 NLRB No. 83, 2009 WL 3149917 (NLRB 2009)(Purchaser held liable for labor

---

[11] This motion has not yet materialized, most likely because it is an even less appealing option than the situation we now have.  The specter of a trustee taking over with extremely limited options and little funding to resolve complicated disputes has loomed for months over this case.

violations following rejection of CBA by predecessor in bankruptcy through 1113 process.) Avanti's labor counsel has submitted a declaration stating that it would be improper for Avanti to meet or negotiate with the unions prior to the sale closing, citing *In re Fall River Dying & Finishing v. NLRB*, 482 U.S. 27 (1987) and *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). This court specifically makes no ruling and has no jurisdiction over the dispute between the unions and Avanti. The relevant inquiry for purposes of the 1113 motion is the good faith of the debtor and the unions, and allegations related to Avanti's hiring practices are irrelevant.

The debtor has shown it negotiated in good faith.

### 8. 1113(c)(2): The Unions Can Only Reject Without Good Cause

Courts have defined the good cause requirement as the counterpart to the requirement that the debtor negotiate in good faith. If a debtor, in good faith, makes a necessary and fair proposal to modify the collective bargaining agreement the union must produce sufficient evidence to justify its rejection of the proposal. *In re Maxwell Newspapers*, *Inc.*, 981 F.2d 85 (2d Cir. 1992).

The CNA did not show adequate cause for refusing the debtor's proposal. Specifically, the CNA maintained its objection to modifying Article 20. It made no counterproposal on the Article 20 issue. Its only counterproposal was to have the nurses improve Medi-Cal submissions and reduce the amount of severance due. These alternatives do not address the acute issues preventing the debtor's reorganization and would not allow the sale to Avanti to go through. SEIU also continued to make demands that the debtor could not meet because Avanti would not agree to them.

While the unions cannot be expected to accept a proposal which rejects their entire CBA, the debtor did offer a reasonable accommodation that was above what employees would receive

had it just closed down.  The proposal the debtor made was the best it could do under

circumstances where Avanti would not agree to more, and any rejection of that proposal

means that a chance to keep the hospital open to benefit all could fail.  Thus, the unions have

not shown adequate cause for rejection of the proposal.


    9. Balance of the Equities Clearly Favors Rejection


The debtor has shown, through a preponderance of the evidence that Avanti will walk away

from the transaction if the debtor does not reject the collective bargaining agreement. If Avanti

walks away, the debtor will liquidate. The debtor's liquidation analysis indicates that only

secured creditors will see any payment under this scenario.  All of the employees will lose their

jobs in this scenario. If the debtor rejects the CBA, then Avanti, presuming it obtains financing,

will complete the hospital purchase. If Avanti completes the hospital purchase, it is likely that

the debtor will receive the AB 1383 funds and unsecured creditors will receive some return.

Many employees will lose their jobs if Avanti purchases the hospital, but it appears that at least

some will be hired and all will receive full payment of previous wage increases. Because an

Avanti purchase increases the likelihood of a return to unsecured creditors, keeps a needed

hospital in the community, and helps some employees to retain their jobs, the balance of

equities favors rejection of the agreements. The alternative of a closure of the hospital next

week is simply not one the court wishes to entertain.

//

//

//

//

//

//

//

//

//

//

///

**IV. Conclusion**

The debtor may reject both CBAs based on the above analysis. To do so reflects solely the reality that this is necessary to salvage at least an operating hospital and some payment to creditors out of an unfortunate situation.  It does not reflect on the abilities, dedication and quality of the workers affected by this rejection.  That fact was never in dispute.

DATED: April 1, 2010

United States Bankruptcy Judge

- 33

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4) Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **AMENDED MEMORANDUM OF DECISION
RE: DEBTOR'S MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE SEIU AND CNA**

was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of_____, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Simon Aron    saron@wrslawyers.com
- Theresa W Bangert    tbangert@sheppardmullin.com
- Manuel A Boigues    bankruptcycourtnotices@unioncounsel.net
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Katherine Bunker    kate.bunker@usdoj.gov
- Young K Chang    bklaw3@yahoo.com
- Kathryn F Evans    kevans@klehr.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
- Jeffrey K Garfinkle    bkgroup@buchalter.com, jgarfinkle@buchalter.com
- Matthew A Gold    courts@argopartners.net
- Michael I Gottfried    mgottfried@lblawllp.com
- Fredric J Greenblatt    fjg@greenblattlaw.com
- Peter D Holbrook    pholbrook@buchalter.com, amelanson@buchalter.com
- Brian L Holman    b.holman@mpglaw.com
- Mark D Houle    mark.houle@pillsburylaw.com
- Ivan L Kallick    ikallick@manatt.com, ihernandez@manatt.com
- John P Kreis    jkreis@attglobal.net
- Mary D Lane    mlane@pszjlaw.com
- George C Lazar    glazar@foxjohns.com
- Scott Lee    slee@lbbslaw.com
- Samuel R Maizel    smaizel@pszjlaw.com, smaizel@pszjlaw.com
- John B Marcin    jbm@marcin.com
- Craig G Margulies    cmargulies@margulies-law.com
- Elissa Miller    emiller@sulmeyerlaw.com
- Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mirmanbubman.com

- David L. Neale     dln@lnbrb.com
- Christopher R Nelson     cnelson@erlaw.com
- Scott H Noskin     snoskin@mbnlawyers.com
- Robert N Phan     rphan@garciaphan.com
- Steven G Polard     spolard@perkinscoie.com
- Andres F Quintana     andres@qlglaw.com
- Christian L Raisner     bankruptcycourtnotices@unioncounsel.net, craisner@unioncounsel.net
- Holly Roark     holly@roarklawoffices.com
- Scott A Schiff     sas@soukup-schiff.com
- Nathan A Schultz     schultzn@gtlaw.com
- Steven A Schwaber     schwaberlaw@sbcglobal.net, sasecf@gmail.com
- Benjamin Seigel     bseigel@buchalter.com, IFS_filing@buchalter.com
- Eric J Siegler     erics123@aol.com
- Adam M Starr     starra@gtlaw.com
- Derrick Talerico     dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov
- Annie Verdries     verdries@lbbslaw.com
- Ryan T Waggoner     rwaggoner@erlaw.com
- Michael H Weiss     mweiss@fms-law.com, lm@weissandspees.com;jb@weissandspees.com
- Michael H Weiss     mw@weissandspees.com, lm@weissandspees.com;jb@weissandspees.com

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page